UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :        Chapter 11

GINKO ASSOCIATES, L.P.                    :

          Debtor                          :        Bankruptcy No. 05-19436bif

..................................................

## ORDER

..................................................

AND NOW, this 25th day of July 2007, for the reasons stated in the accompanying memorandum, it is hereby ordered that the debtor's objection to the amended proof of claim filed by Mr. Luan Tota is granted in part and denied in part.

The debtor's objection to that portion of the amended claim concerning damages for delay in opening Branzino Restaurant, ¶ A(3), and for attorney's fees, ¶ D, is sustained and those portions of the amended claim are disallowed.

The debtor's objection to ¶¶ A(1), (2), B, C, and E are not sustained. Damages for those portions of the amended claim will be fixed via trial to be held on September 24, 2007 at 2:00 p.m. in Bankruptcy Courtroom #2.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Ginko Associates
P.O. Box 147
Wynnewood, PA 19096

Dimitri L. Karapelou, Esq.
Ciardi & Ciardi, P.C.
One Commerce Square
2005 Market Street, Suite 2020
Philadelphia, PA 19103

Joseph J. O'Neill, Esq.
Maryanne Huha Finigan, Esq.
Joseph J. O'Neill & Associates
123 S. Broad St., 24th Floor
Philadelphia, PA 19109

Harry G. Mahoney, Esq.
Kimberly Frascella, Esq.
Deasey Mahoney & Bender LTD
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA 19103

Ms. Barbara Townsend, Courtroom Deputy

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :        Chapter 11

GINKO ASSOCIATES, L.P.                             :

              Debtor                               :        Bankruptcy No. 05-19436bif

..................................................

MEMORANDUM

..................................................

          Before me is the debtor's amended objection to the amended proof of claim,

docketed as claim #8, filed by Mr. Luan Tota, t/a Branzino Restaurant. This creditor

asserts an unsecured claim totaling $234,160.55 in connection with the lease of

commercial real estate located at 259-61 South 17th Street, Philadelphia, Pennsylvania.

Mr. Tota, the owner and operator of Branzino Restaurant at that location, maintains that

the debtor, as lessor, owes him for certain repairs undertaken by him to the leasehold, for

improvements to the leasehold, for damages resulting from flooding caused by a broken

water pipe on a floor above his leased space, and for lost business due to a delay in

opening the restaurant as well as due to the closure of the restaurant during the repairs

from the water pipe flood. In addition, he seeks attorney's fees and costs. Finally, the

creditor maintains that the debtor has failed to credit him with a $7,000 security deposit.

          The debtor filed an amended objection to this amended proof of claim,

disputing that Mr. Tota is entitled to any credit for repairs or improvements made to the

leasehold. Ginko further avers that it bears no responsibility for any delays in the opening

of the restaurant. And the debtor also maintains that a provision of an addendum to the

lease absolves the lessor from any liability caused by the burst water pipe. Furthermore,

the debtor contends that Mr. Tota is delinquent in rent payments, which delinquency is in excess of the security deposit.

Because of the size of the claim and the factual and legal issues involved therein, the parties stipulated that the amended claim objection should be treated as though it were an adversary proceeding, with ample time for discovery. Later, during a pretrial conference, they agreed that the resolution of the claim objection should be bifurcated, with trial on the issue of the debtor's liability to be resolved first, to be followed by a damages hearing, if necessary. Thus, issues of rent delinquency, security deposit, amounts of lease credits (if any) and amount of damages (if any) caused by water leakage, including lost business, would be deferred until liability was determined.

Because of the preparedness of counsel, the liability phrase of the trial was completed in one full day of testimony and focused upon three factual or legal issues: Was Mr. Tota entitled to rent credits for repairs and improvements to the leasehold? Was the debtor liable for damages caused to Mr. Tota's business and property by the water pipe leak? And was the debtor liable for damages when Mr. Tota opened his restaurant later than he had intended? I can also address the legal issue of Mr. Tota's claim for attorney's fees without considering the amount of those fees.

As to the second issue, the debtor conceded at the outset of trial that the leak causing water damage to the leasehold was due to its negligence; thus, there was minimal evidence offered surrounding the cause of the water leak. Although admitting its negligence, the debtor maintains that the lease agreement contains a provision exculpating it from liability for such negligence. Mr. Tota counters that the lease does not so provide; alternatively, if the lease contained an exculpatory clause in favor of the lessor, Mr. Tota

2

argues that such a clause is not enforceable because he could not understand it, and so could not consent to its terms.

The following facts were proven and are detailed in narrative form.

I.

A.

The claimant, Mr. Juan Tota, is a citizen of Albania who came to this country, and to Philadelphia, in November 1999. He had owned and run a restaurant in Albania and hoped to do the same here. For several years, he worked in various Philadelphia restaurants. He learned English through his employment activities and by watching television. While working for others in Philadelphia, he planned to open his own restaurant.

Mr. Tota's cousin, Muharrem Himallari (a/k/a, and hereinafter, Mario Hima), also an Albanian citizen, had arrived in the United States a few years before Mr. Tota. He owned and operated a restaurant in Philadelphia, and decided to open another restaurant.

The debtor, Ginko Associates, L.P., was the owner of property located at 259-261 South 17th Street, Philadelphia, Pennsylvania.[1] On January 9, 2002, Ginko

---

[1]The premises were sold on June 8, 2006 to PBRG Acquisitions, LP and the lease assigned to this new owner. See May 17, 2006 Order (docket #181). Nonetheless, the parties agreed that, for purposes of this claim objection, Ginko was the owner of the subject property and should be considered the lessor. And, as the debtor did not raise the issue, I shall assume for

(continued...)

entered into a lease agreement with Mr. Hima for rental of the premises, being a portion

of the first floor of the building at 259 South 17th Street, as well as the first floor and

basement of the building at 261 South 17th Street. Ex. C-1. (The upper floors of the

buildings were vacant and not part of the leased space.) This lease agreement, specific

terms of which will be discussed below, was signed by Mr. Wilson Rigdon as president of

Mortar, Inc., a general partner of Ginko Associates, and by Mr. Hima. The lease was

attested to by Mr. Samuel Shevlin, Esq., Mr. Hima's attorney.

   The lease agreement contained an Addendum, Ex. C-2, which detailed the

monthly rent, the date of the first rent payment, the beginning and ending date of the five

year rental term, and the amount of the security deposit. This Addendum, also executed

on January 9, 2002, provides "[n]otwithstanding anything set forth in the pre-printed

Lease Agreement to the contrary, the parties hereto, intending to be legally bound hereby,

do agree as follows[.]" Ex. C-2 (preface). The Addendum was also signed by Mr.

Wilson Rigdon and Mr. Hima.

   The Addendum established monthly base rent in year one at $3,500, rising

to $4,418.67 by year five. Ex. C-2, at § 2. Mr. Hima, as lessee, was required by the terms

of the Addendum to deposit a security deposit in the amount of $7,000 upon execution of

the lease. Id., at § 15. Apparently, such a deposit was paid to Ginko.

---

[1](...continued)
purposes of liability that section 11 of the Lease Addendum, containing an overall limitation on
liability, has no applicability to this phase of the parties' dispute. Furthermore, the debtor's
confirmed plan provides that allowed claims of unsecured creditors will be paid in full. See
"Second Modified Second Amended Plan," dated May 11, 2006, Article III, ¶ 3.5.

4

Before Mr. Hima opened a restaurant at this location, he was deported back to Albania. After Mr. Hima returned to Albania, he and Mr. Tota agreed that Mr. Tota, who was seeking rental space for his own restaurant, should take over the 17th Street location. They orally agreed that the two would be partners in the venture, with Mr. Hima expecting to return to the United States; however, Mr. Tota eventually took over full ownership of the restaurant when it was clear that Mr. Hima would not be permitted to return to this country.

Mr. Tota testified that business arrangements were informal in Albania, with commercial leasing agreements orally made and only basic terms discussed. Thus, he professed unfamiliarity with the formalism of lease agreements in the United States. Nonetheless, when Mr. Tota and Mr. Hima discussed the former's succeeding the latter as tenant at the Ginko property, Mr. Hima recommended that Mr. Tota communicate with attorney Shevlin.

Mr. Tota did visit Mr. Shevlin and obtained copies of the lease agreement and its addendum. Mr. Tota also communicated with Mr. Whit Garrett, Ginko's property manager for the 17th Street property, about the lease of the restaurant space.[2] Mr. Garrett recalled that Mr. Hima spoke with him from Albania explaining that Mr. Tota, his cousin, wanted to take over the lease space.

On May 1, 2003, Mr. Tota, Mr. Hima, and Ginko entered into an agreement termed a "Lease Modification Agreement." Ex. C-3. The modification agreement was

---

[2]Mr. Garrett worked for Urban Shelter, a company controlled by Wilson Rigdon, president of the general partner of Ginko. Later, Walter Wood Realty took over management of the Ginko properties. There is no dispute that, at the times relevant, Mr. Garrett was a duly authorized agent of the lessor.

signed by Mortar Inc., as general partner of Ginko Associates, and by Mr. Tota. In addition, Mr. Tota signed Mr. Hima's name.[3] Mr. Tota was not represented by counsel at this signing.

The modification agreement did not extinguish the prior lease, nor did it substitute Mr. Tota for Mr. Hima as lessee by way of assignment. Nor did it provide for Mr. Tota to be a subtenant. Rather (and this may be consistent with the partnership understanding between Messrs. Tota and Hima), Mr. Tota was simply "added to the lease agreement as Lessee under the Lease as of the date hereof." Ex. C-3, ¶ 1. Accordingly, both Mr. Tota and Mr. Hima were jointly and severally liable under the January 2002 lease. Id.

The modification agreement "ratified" all of the terms of the January 2002 lease. Ex. C-3, ¶ 5.[4] Although Mr. Tota had copies of the lease and its addendum, he did not read the Lease Agreement or Addendum prior to his signing the Modification. He justifies this failure by explaining that his English was not good enough to understand the terms. He also conceded that he did not ask for an explanation of any of the terms from Messrs. Rigdon, Garrett or Shevlin, due to his eagerness to operate his own restaurant. At

---

[3]That Mr. Tota signed Mr. Hima's name in his absence was revealed through testimony at trial. As Mr. Hima was not present in Philadelphia to sign the agreement, nor was it ever mailed to him, obviously Ginko and Mr. Tota were aware on May 1, 2003 that Mr. Hima had not actually signed the document. Nonetheless, both believed from conversations had with him, that Mr. Hima consented to his cousin being added to the lease. Thus, neither party suggests that the modification agreement was invalid due to Mr. Hima's failure to actually sign the document.

[4]While the modification agreement does not expressly mention the lease addendum, the parties assume that the reference in the Modification to the January 2002 lease included the addendum as well. I agree that this was the probable intent of the parties, especially since many of the specific lease terms are only found in the addendum and the lease refers to the addendum.

6

some point after the modification agreement was signed, he attempted to read the lease and found it difficult.

After the May 1, 2003 modification signing, Mr. Tota informed Mr. Hima that he had been added to the lease and spoke with him telephonically about the efforts to open the restaurant and for advice on certain start-up issues. Thus, Mr. Hima was aware of Mr. Tota's addition as lessee.

The January 2002 lease addendum, Ex. C-2, called for a five year lease term, with base rental payments during the first twelve months of $3,500 monthly. Id., at § 2. Rental payments were to commence only "on the date Lessee shall take possession of the demised premises or be deemed to have taken possession of the demised premises pursuant to Section 8 below. . . ." Id., at § 1.

Section 8 of the Addendum has no provision related to the commencement date of the lease. But section 9 states in part:

> Upon execution of the Lease, Lessor shall commence
> Lessor's Work and prosecute same to completion using all
> reasonable efforts. Lessor shall notify Lessee that Lessor's
> Work is substantially completed and Lessee shall take
> possession of the demised premises within five (5) days of
> such notice. Lessee's obligation to pay the Base Rent shall be
> abated until the earlier of the date Lessee taking possession of
> the demised premises or five (5) days following Lessor's
> notice to Lessee.

Id., at § 9.

It is undisputed that Mr. Hima did not tender any rental payments to Ginko after signing the lease in January 2002. Nor is there any evidence that Ginko made demand for such payments or performed the work required by section 9 of the addendum.

7

Sometime after the lease modification was signed in May 2003, Mr. Garrett, as agent for

Ginko, hand-wrote the following, with Mr. Tota's signature appearing below:

> Rent is to start as of September 1, 2003.  Payment to be as
> follows:
>
> August 1, 2003—  $1750.00
> September 1—      $1750.00
> October 1, 2003—  $1750.00
> As of November 1, 2003, rent shall be $3500.00 per the lease.

Ex. C-3, at 3.

After he signed the lease modification in May 2003, Mr. Tota took steps to

prepare the leasehold for use as a restaurant.  He bought kitchen utensils and pots and

pans (Mr. Hima had already ordered kitchen equipment, for which Mr. Tota paid), hired

someone to design a menu and another individual to paint a mural in the dining room,

hired an accountant to complete necessary business forms, and purchased insurance with

the assistance of a friend.  In addition, Mr. Tota: had the basement cleaned out; installed a

concrete floor and sump pump in the basement; had electrical work done; dry-walled the

dining room and basement walls; painted the first floor walls and ceiling; and carpeted the

first floor.

Mr. Tota often consulted with Mr. Garrett regarding certain repairs.  To

meet Philadelphia health and safety code requirements, Mr. Tota had work performed on

the exterior stairs, made the restrooms handicap-accessible, and sheet-rocked exterior

walls for fire-proofing purposes.  Mr. Garrett acknowledged at trial that he authorized Mr.

Tota to get this work done and stated that the lessor would issue a rent credit in return.

Similarly, Mr. Garrett offered a rent credit in return for Mr. Tota arranging for air

conditioner duct work and "re-charging," and for heating unit upgrades.  See Exs. C-6

8

(invoice for heat and air-conditioning work), C-8 (invoice for gas furnaces), and C-10

(invoice connected with heater). Mr. Tota was advised by a contractor installing a fire

alarm system that, for an additional sum, the system panel could cover the entire building

instead of just the portion that Mr. Tota was renting. Mr. Garrett authorized the

additional expense in exchange for a rent credit for that portion. See Ex. C-5 (invoice for

fire alarm installation). Finally, Mr. Tota testified that Mr. Garrett promised a rent credit

for the repairs to the basement of the premises, which periodically flooded. See Ex. C-7

(invoice for basement clean-up and waterproofing). Mr. Garrett did not recall so

authorizing this credit; however, he did not recall not authorizing it. I find it was more

likely than not that he did so authorize this credit and all the others, subject to a

reasonableness standard.

For all of these rent credits, Mr. Tota testified that he did not know when he

would receive them, and that he was more concerned with opening the restaurant and then

pursuing the issue of rent credits with the lessor at a later date. None of the rent credit

agreements with Mr. Garrett were memorialized in writing. However, Mr. Tota stated

that he obtained oral approval for the rent credits sought, and contemporaneously sent all

of the applicable invoices to Mr. Garrett. I find that testimony credible.

Mr. Garrett confirmed that he offered rent credits for the repairs to the

restroom, exterior stairs, fire panel, sheet-rocking the exterior walls, and repairing the

heat and air-conditioning, to the extent those costs were reasonable. He received

authorization for some or all of these rent credits from Mr. Rigdon. In 2004, Mr. Tota

actually received rent credits for two new air conditioning units installed with Mr.

Garrett's permission—these were the only rent credits Ginko ever applied to offset the rent.

Mr. Tota intended to open his restaurant right after Labor Day weekend in September 2003, although he did not discuss this with Mr. Garrett. Sometime in August 2003, he checked the air conditioning units for the first time and found that they were insufficient to cool the entire restaurant premises. As mentioned above, he had the air conditioning system repaired with the promise of a future rent credit. He asserts that the delay caused by the need for the air conditioning repair in turn delayed the opening of the restaurant to October 2, 2003, 20 days later than he intended, costing him in lost business.

In January 2005, a water pipe located on the unheated, non-leased second floor of the premises froze and broke, flooding the restaurant, basement and storage areas. The second floor of the building had been vacant—Mr. Tota had advised the lessor several times that homeless people were staying there and that doors and windows were often left open, but the lessor did not send anyone to fix these problems. The debtor at trial admitted that the water pipe breakage was due to its negligence.

The flood damaged the restaurant's ceiling and walls, rugs and furniture. The wall mural had to be repainted. Mr. Tota applied to his insurance provider, but not all claims of repairs and loss profits were reimbursed. Mr. Tota maintains that the restaurant was closed for about two months due to needed repairs.[5]

------

[5]The docket entries reflect that on February 15, 2007, Regis Insurance Company filed a motion to intervene in this dispute, averring that it paid Branzino about $30,000 on its claim for damages and lost profits arising from the burst water pipe, and asserting that it has a right of subrogation against Ginko. On March 29, 2007, Regis's intervention motion was granted by agreement of the parties, and the insurance carrier was permitted to intervene in the damage aspect of the dispute.

(continued...)

10

B.


The Lease Agreement is a form document likely chosen by Ginko. Mr. Garrett acknowledged that Ginko, through its counsel, drafted the Lease Addendum as well as the Lease Modification.

Section 11[6] of the Lease Agreement states:

(a) Lessee agrees to be responsible for and to relieve and hereby relieves the Lessor from all liability by reason of any injury or damage to any person or property in the demised premises, whether belonging to the Lessee or any other person, caused by any fire, breakage or leakage in any part or portion of the demised premises, or any part or portion of the building of which the demised premises is a part, or from water, rain or snow that may leak into, issue or flow from any part of the said premises, or of the building of which the demised premises is a part, or from the drains, pipes, or plumbing work of the same, or from any place or quarter, *unless* such breakage, leakage, injury or damage be caused by or result from the negligence of Lessor or his servants or agents or any person or persons whatsoever.

Ex. C-1, § 11(a) (emphasis supplied). The word "unless" replaced the form's original word, "whether." Id.

_____

[5](...continued)
Ginko and Mr. Tota agreed that the subrogation claim of Regis was not before me on the issue of Ginko's liability. As Regis did not participate in the liability trial I express no position whether the lease agreements bar any such subrogation claim. See Church Mutual Ins. Co. v. Palmer Const. Co., Inc., 153 Fed. Appx. 805 (3d Cir. 2005) (non-precedential) (insured may validly waive right to subrogation under Pennsylvania law); Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc., 916 A.2d 686 (Pa. Super. 2007).
I also note that Regis did not agree with Mr. Tota's assessment of damages caused by the water pipe leak.

[6]The photocopy of the document clipped the section numbers on the second page of the exhibit.

11

The Lease Addendum, in section 10, required the lessee to obtain an

insurance policy of "comprehensive general public liability insurance, including

contractual liability and fire legal liability coverages . . . for bodily or personal injury or

death per person and property damage." Ex. C-2, at § 10. This section also provided:

> Upon execution of this Lease and prior to Lessee taking
> possession of the demised premises, Lessee shall deliver to
> Lessor a copy of said insurance policy(ies) or a Certificate of
> Insurance evidencing said coverage and shall provide proof of
> payment of the premiums therefor. . . . Lessee acknowledges
> and agrees that Lessor shall not be responsible or liable in any
> way to Lessee or any other person, for any damage or loss to
> any personal property, equipment, fixtures and/or leasehold
> improvements of Lessee or any other person upon the
> demised premises. Lessee agrees to maintain throughout the
> term of this Lease and any extensions or renewals, a policy of
> fire and hazard insurance covering all of Lessee's contents
> and leasehold improvements at the demised premises at the
> replacement value thereof.

Regarding the repairs and improvements undertaken by the claimant, the

Lease Addendum provided that "[e]xcept as otherwise specifically provided for in this

Lease, Lessor shall not be responsible for any repairs or replacements to the demised

premises." Id., at § 7. In addition, [e]xcept as specifically provided . . . Lessor shall not

be obligated to make any alterations, installations or improvements to the demised

premises[,]" id., at § 8, and the lessee was to perform any alterations, installations or

improvements at its sole cost and expense, with prior approval in writing by the lessor.

Id.

Section 9 of the Addendum, however, provides exceptions to the lessor's

lack of responsibility to make repairs or improvements to the premises. Therein, the

lessor, at its own cost, agreed to finish the walls and ceiling of the first floor of the 261

South 17th Street building; repair the rear portion of the floor of the building with

12

plywood; provide access to and from the front portion of 259 South 17th Street and the

rest of the demised premises; install heating and air conditioning systems; reasonably

secure all exterior doors and windows; remove the security gate over the window and the

iron gate at the front of 261 South 17th Street; "rough in" plumbing supply and waste

lines to the kitchen and restroom(s); and provide 200 amp electric service. Id., at § 9.

Concerning subsequent oral modifications of the agreements, the

Addendum provided:

> 23. ENTIRE AGREEMENT. It is expressly understood and
> agreed by and between the parties hereto that this Lease sets
> forth all the promises, agreements, conditions and
> understandings between Lessor or its Agent and Lessee
> relative to the demised premises, and that there are no
> promises, agreements, conditions or understandings, either
> oral or written, between them other than are herein set forth.
> It is further understood and agreed that, except as herein
> otherwise provided, no subsequent alteration, amendment,
> change or addition to this Lease shall be binding upon Lessor
> or Lessee unless reduced to writing and signed by them.

Id., at § 23.[7]


II.


In his amended proof of claim, Mr. Tota divides his $234,160.55 claim into

five categories.[8]  First, he asserts that the debtor owes him for repairs and improvements

performed by him, but that were the obligation of the lessor from the outset of the lease

---

[7]The Lease Agreement includes a similar clause at paragraph 26. See Ex. C-1.

[8]As mentioned above, because I bifurcated the liability issues from the damages
issues, the specific amounts for each of the five categories of Mr. Tota's claim need not be
detailed.

agreement and for which the lessor promised rent credits. Included in this category are repairs and improvements made to the basement to permit food storage, and damages for delay in opening the restaurant due to the air conditioner repair.

Next Mr. Tota claims the debtor is liable for damages incurred in connection with the burst water pipe in January 2005. This portion of the claim consists of repairs to the premises and an estimated loss of profit during the period that the restaurant was closed for repairs.

Third, Mr. Tota claims damages for the cost of repairs to prevent "persistent surface water flooding" of the basement storage area.

Fourth, Mr. Tota claims an entitlement to attorney's fees, including those incurred in this bankruptcy case.

And, last, Mr. Tota demands either credit for the $7,000 security deposit or the debtor's transfer of that deposit to the purchaser of the leasehold.

I shall consider the debtor's liability for the first four categories. (This last category will not be considered at this time.)

A.

Mr. Tota's claim includes request for reimbursement of attorney's fees and costs. In general, the "American Rule" regarding attorney's fees in federal court cases, see generally, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240 (1975), is applicable to bankruptcy litigation. See, e.g., Matter of Pro-Snax Distributors, Inc., 157 F.3d 414, 419 (5th Cir. 1998); In re Computer Learning Centers, Inc., 285 B.R. 191, 222

14

(Bankr. E.D. Va. 2002); In re Jessee, 77 B.R. 59, 61-62 (Bankr. W.D. Va. 1987). Thus,
each party in a federal court dispute, including bankruptcy disputes, typically must pay his
own counsel fees, regardless of the outcome.

There are exceptions to this general principle. Certain statutes may permit a
prevailing party to obtain counsel fees from another party. See, e.g., 11 U.S.C. § 523(d);
Fogle v. William Chevrolet/Geo, Inc., 275 F.3d 613 (7th Cir. 2001). One party may
agree, by contract or stipulation, to pay the counsel fees incurred by another party. See,
e.g., Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716 (6th Cir. 1996); In re Auto
Specialties Mfg. Co., 18 F.3d 358 (6th Cir. 1994). In addition, "a court may assess
attorneys' fees for the 'willful disobedience of a court order . . . as part of the fine to be
levied on the defendant . . .' or when the losing party has 'acted in bad faith, vexatiously,
wantonly, or for oppressive reasons. . . .'" Alyeska Pipeline Service Co. v. Wilderness
Society, 421 U.S. at 258-59 (quoted citations omitted); see, e.g., Chambers v. NASCO,
Inc., 501 U.S. 32, 45-46 (1991). Thus, a federal court may assess attorney's fees as part
of a civil contempt sanction. See, e.g., Chambers v. NASCO, Inc., 501 U.S. at 53-54;
Robin Woods Inc. v. Woods, 28 F.3d 396, 400 (3d Cir. 1994). It is also true that
litigation brought in bad faith can result in an award of counsel fees to the prevailing
party. See In re Hammett, 28 B.R. 1012, 1015 (E.D. Pa. 1983) ("It is now well-settled
that a bankruptcy court may assess counsel fees against a party who has acted
contemptuously or in bad faith.").

Mr. Tota does not suggest that any of these exceptions apply. He points to no contractual provision authorizing fee shifting.[9] There is no statutory fee-shifting provision relevant.[10] And, there is no evidence that this debtor has acted "in bad faith, vexatiously, [or] wantonly" during the course of his litigation with the claimant, nor exhibited "a willful and persistent defiance of the law." Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. at 258-59; see Straub v. Vaisman & Co., Inc., 540 F.2d 591, 598-99 (3d Cir. 1976); In re Hammett, 28 B.R. at 1018. "[T]he standard for applying counsel fees under the bad faith exception is quite stringent," Keck v. Commercial Union Ins. Co., 758 F. Supp. 1034, 1041 (M.D. Pa. 1991), and has not been established in this amended claim dispute.

Thus, that portion of the proof of claim shall be disallowed.

B.

At the conclusion of the trial on liability, Ginko conceded that to the extent Mr. Garrett promised rent credits to Mr. Tota, such a promise was enforceable. That is, even though the lease and addendum contained provisions limiting the lessor's responsibility for repairs and improvements, a duly authorized agent of the lessor can alter those terms. See Fay v. Ryan, 818 F. Supp. 882, 887 (W.D. Pa. 1993) (principal is bound by contracts made by its agents acting within their authority); Aeroquip Cop. v. Adams,

---

[9]Section 14 of the addendum contains a provision requiring the lessee to indemnify the lessor for attorney's fees in narrow circumstances. Such a provision is not germane to the lessee's present claim for counsel fees from the lessor.

[10]Section 506(b) of the Bankruptcy Code is not applicable to this dispute.

16

203 F.3d 830 (table), 1999 WL 1073699, at *2 (9th Cir. Nov. 24, 1999) (agent with

apparent authority to modify contract can bind principal).  Clearly, the evidence shows

that Mr. Tota relied upon Mr. Garrett's promises.

   Despite contract clauses purporting to limit a contract to its written terms,

as existed in Ginko's lease agreement, the Third Circuit Court of Appeals has observed

that "[i]t is well-settled law in Pennsylvania that a 'written contract which is not for the

sale of goods may be modified orally, even when the contract provides that modifications

may only be made in writing.'" Hampden Real Estate, Inc. v. Metropolitan Management

Group, Inc., 142 Fed. Appx. 600, 603, 2005 WL 1842116, at *3 (3d Cir. Aug. 4, 2005)

(quoting Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc., 454 Pa. Super. 188,

685 A.2d 141, 146 (1996)).  "'The modification may be accomplished either by words or

conduct,' First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 280 (3d

Cir. 1987), demonstrating that the parties intended to waive the requirement that

amendments be in writing, Somerset Cmty. Hosp., 685 A.2d at 146." Id.; see Accu-

Weather, Inc. v. Prospect Communications, 435 Pa. Super. 93, 102, 644 A.2d 1251, 1255

(1994) (same); see also 13 Williston on Contracts § 39.30 (4th ed.) ("Generally, an

implied waiver of nonperformance under a contract may be established by a party's

conduct which is inconsistent with the assertion of the right to performance allegedly

waived, or by conduct which indicates that strict compliance with the contract will not be

required, provided that the conduct manifests the requisite intent to waive the right to

performance, or has induced reliance on the apparent waiver of the right by the other

party.") (footnotes omitted).  Modification must be proved by clear and convincing

evidence. 2101 Allegheny Associates v. Cox Home Video, Inc., 1991 WL 225008, at *5;

see also Somerset Cmty. Hosp., 685 A.2d at 146 (citing Pellegrene v. Luther, 403 Pa. 212, 169 A.2d 298 (1961)).

Equitable considerations such as waiver, fraud, mistake, accident or reliance "will constitute grounds for looking beyond the contract term prohibiting oral modification." Delaware River Port Authority v. Thornburgh, 585 A.2d 1123, 1128 (Pa. Cmwlth. 1989); see Admark, Inc. v. RPS, Inc., 1998 WL 19481, at *4 (E.D. Pa. Jan. 20, 1998) (either additional consideration or reliance is required to support a contractual modification); 2101 Allegheny Associates v. Cox Home Video, Inc., 1991 WL 225008, at *5 (E.D. Pa. Oct. 29, 1991) (consideration or reliance needed to modify a contract), aff'd, 975 F.2d 1552 (3d Cir. 1992).

In this instance, Ginko was contractually obligated to make certain impairs and improvements to the leasehold, which it did not do. Furthermore, through Mr. Garrett, it authorized the lessee to make certain repairs and improvements that would benefit the entire real estate, not just the leasehold.

Having heard the testimony of Mr. Tota and Mr. Garrett, I conclude that all of the improvements and repairs for which Mr. Tota demands credit were either contractually due to the lessee or authorized by Mr. Garrett. However, I found credible Mr. Garrett's testimony that his authorization to Mr. Tota to proceed was limited to reasonable costs of improvements and repairs.

Accordingly, at the damage phase of this claims dispute, Mr. Tota will have to demonstrate that the improvements and repairs were made and that the costs for which he surcharges the debtor were reasonable and actually incurred. Upon meeting this burden, that portion of the proof of claim shall be allowed.

18

C.

Mr. Tota's claim for lost profits due to opening his restaurant on a date later than he anticipated stems from problems with the air conditioning system.

As mentioned above, section 9 of the lease addendum required the lessor to "[i]nstall heating and air conditioning system to service demised premises (except kitchen area and basement; kitchen equipment exhaust to be installed by Lessee)." Ex. C-2, § 9. There was an air conditioning system in the leasehold when Mr. Tota took over in May 2003, but he never tested it until August 2003. Upon testing, Mr. Tota concluded it was inadequate. And while Mr. Garrett agreed, and Ginko repaid him for the cost of repairing and improving the system, the time it took to find a contractor to do the work delayed the restaurant's opening.

Section 9 of the lease addendum, captioned "Lessor's Work to Premises" states in part:

> Lessor's Work is intended to place the demised premises (including the basement area) into a condition which is ready for finishing by the Lessee.
> ***
> All of Lessor's Work shall be performed in a good and workmanlike manner. Upon execution of the Lease, Lessor shall commence Lessor's Work and prosecute same to completion using all reasonable efforts. Lessor shall notify Lessee that Lessor's Work is substantially completed and Lessee shall take possession of the demised premises within five (5) days of such notice. Lessee's obligation to pay the Base Rent shall be abated until the earlier of the date Lessee taking possession of the demised premises or five (5) days following Lessor's notice to Lessee.

Ex. C-2, § 9.

19

This lease addendum was signed in January 2002. Ginko did not perform the required air conditioner work and Mr. Hima, the lessee, did not demand it of the lessor. Nor was any base rent paid. Instead, after May 2003, the lease modification agreement provided that partial base rent would become due beginning August 2003 (or September; the provision is ambiguous) and full base rent would commence in November 2003. Ex. C-3. By virtue of this hand-written modification provision, the earlier lease addendum provision regarding the date of possession by the lessee and the commencement of rent payments, was altered.

Mr. Tota was aware that he would begin paying partial rent in August or September 2003, as he signed this hand-written modification provision, and he was given access to the leasehold in May 2003. He also knew that Mr. Hima had signed a lease more than one year before, and that little if any work on the leasehold had taken place. He had no reason to assume that the lessor had complied with its air conditioner responsibilities. And he offered no explanation for not learning of the cooling issue sooner than August 2003.

Accordingly, having agreed to begin paying partial rent on a fixed date, having agreed to have the repair work on the air conditioner done by contractors he hired, the cost of which the lessor repaid, and having waited three months after obtaining possession to first check on the efficacy of his cooling system, Mr. Tota cannot hold Ginko financially liable for the delay in opening this restaurant. See Minster v. Pennsylvania Co. for Ins. on Lives and Granting Annuities, 104 Pa. Super. 301, 305 (1932) ("[W]here a contract is originally indefinite as to time, or has become indefinite by mutual agreement, neither party has the right to put the other in default without giving

20

him a reasonable time within which to make good."); cf. Siegel v. Engstrom, 235 A.2d

365, 368, 427 Pa. 381, 385 (1967) (lessee who "stood idly by" while lessor allowed

another party to drill on property could not wait to complain when oil was found).

Therefore, this aspect of his amended claim shall be disallowed.

### III.

The final issue addressed by the parties, and the one to which they have

devoted the most attention, is Mr. Tota's claim for damages caused by the burst water

pipe in January 2005. At that point, the restaurant had opened and sustained water

damage to the personal property. Mr. Tota estimated that repairs to the leasehold took

two months, during which the restaurant was closed. The debtor concedes that its

negligence caused the burst water pipe.

Nonetheless, Ginko asserts that the lease addendum bars any claims for

damages due to its negligence.[11] The debtor relies upon the above-quoted language found

in section 10 of the lease addendum. Mr. Tota counters with the language of paragraph

11 of the lease itself, as altered, which was also quoted earlier. He also argues that given

his lack of English language skills, an enforceable exculpation clause would be invalid as

unconscionable.

Recently, the Pennsylvania Supreme Court discussed the issue of

unconscionability under state law in these terms:

---

[11]Ginko raises no other defense to its liability for its negligence.

21

> The doctrine of unconscionability has been applied in
> Pennsylvania as both a statutory and a common-law defense
> to the enforcement of an allegedly unfair contract or
> contractual provision. . . . This Court, however, has not
> frequently discussed the common-law application.
> Nevertheless, we agree with the general formulation which
> has been applied fairly consistently in the intermediate
> appellate courts, and which borrows from the statutory
> version and is largely consonant with the Second Restatement
> of Contracts. See Restatement (Second) of Contracts § 208
> (1981).
>
> Under that formulation, a contract or term is unconscionable,
> and therefore avoidable, where there was a lack of meaningful
> choice in the acceptance of the challenged provision and the
> provision unreasonably favors the party asserting it. . . . The
> aspects entailing lack of meaningful choice and
> unreasonableness have been termed procedural and
> substantive unconscionability, respectively. . . . The burden
> of proof generally concerning both elements has been
> allocated to the party challenging the agreement, and the
> ultimate determination of unconscionability is for the courts.

Salley v. Option One Mortg. Corp., 925 A.2d 115, 119-120 (Pa. 2007) (footnote and

citations omitted).[12]

    Mr. Tota's professed lack of English language skills notwithstanding, he

has not met his evidentiary burden on this issue. His contention overlooks that it was his

cousin, Mr. Hima, while represented by counsel, who negotiated the terms of the lease

and the lease addendum. Mr. Tota later decided to accept all of the terms negotiated by

his cousin without questioning anyone about them, including Mr. Hima's counsel.

Having elected to accept without question whatever lease terms Mr. Hima had negotiated,

Mr. Tota cannot persuasively argue that he had no meaningful choice in those terms or

that they unreasonably favored the lessor. See generally Schoble v. Schoble, 349 Pa. 408,

---

[12]As the leasehold is in Philadelphia and the lease agreements were all entered into
in Philadelphia, Pennsylvania law applies.

22

411-412 (1944) ("A person of age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument which he signed.").

Although I disagree with Mr. Tota's unconscionability argument, I agree that the contracts between lessor and lessee did not exculpate Ginko from all liability for its own negligence.

First, the language of section 11 of the form lease is not new. Pennsylvania's Court of Common Pleas discussed the identical (without alteration) clause over 40 years ago, upholding the lessor's relief from liability for water damages pursuant to its terms. See Frankel v. Arch Street Corp., 35 Pa. D. & C.2d 453 (Ct. Common Pleas, Phila. Cty, 1964). However, the language of section 11 was altered in this proceeding to delete the word "whether" and replace it with the word "unless." The lease therefore stated (in pertinent part) that: "Lessee agrees to be responsible for and to relieve and hereby relieves the Lessor from all liability by reason of any injury or damage to . . . property in the demised premises, . . . caused by any . . . leakage . . . or from water, rain or snow that may leak into . . . any part of the said premises, . . . *unless* such . . . leakage . . . be caused by or result from the negligence of Lessor . . . ." Ex. C-1.

About 20 years ago, the Pennsylvania Supreme Court held a lessor liable when the same lease clause had been modified by a typewritten addendum stating: "Notwithstanding the provisions of paragraph 11(a) of the lease agreement the negligence of the lessor, his servants or agents shall be excepted therefrom." Princeton Sportswear

23

Corp. v. H & M Associates, 510 Pa. 189, 194 (1986). Thus the form lease provision can be modified by the parties to hold the lessor liable for its own negligence.

Indeed, in Kotwasinski v. Rasner, 436 Pa. 32 (1969), where an identical exculpatory clause was also identically altered by striking the word "whether" and replacing it with the word "unless," Pennsylvania's Supreme Court interpreted the modification as one "in which the lessors are obviously made liable for damages resulting from their negligence." Id., at 37. Accordingly, section 11 of the lease, standing alone, would hold the debtor liable for damages due to water leakage cause by the debtor's negligence.

Ginko, however, focuses on the language of section 10 of the lease addendum, and argues that it overrides the provisions of section 11 of the lease. Section 10 required the lessee to obtain an insurance policy of "comprehensive general public liability insurance, including contractual liability and fire legal liability coverages . . . for bodily or personal injury or death per person and property damage[,]" and provided that the "Lessee acknowledges and agrees that Lessor shall not be responsible or liable in any way to Lessee or any other person, for any damage or loss to any personal property, equipment, fixtures and/or leasehold improvements of Lessee or any other person upon the demised premises." Ex. C-2.

Pennsylvania public policy does not prohibit private parties from including exculpation clauses in their contracts. See Cannon v. Bresch, 307 Pa. 31 (1932). However, Pennsylvania does require that any waiver by a lessee of a lessor's liability for negligence be "plainly expressed." Id., at 36. More recently, the Pennsylvania Supreme

24

Court explained this requirement in a dispute between a lessor and a lessee also involving

water damage cause by a burst pipe:

> It is generally accepted that an exculpatory clause is valid
> where three conditions are met.  First, the clause must not
> contravene public policy.  Secondly, the contract must be
> between persons relating entirely to their own private affairs
> and thirdly, each party must be a free bargaining agent to the
> agreement so that the contract is not one of adhesion. . . .  In
> Dilks v. Flohr Chevrolet, 411 Pa. 425 . . . (1963), we noted
> that once an exculpatory clause is determined to be valid, it
> will, nevertheless, still be unenforceable unless the language
> of the parties is clear that a person is being relieved of liability
> for his own acts of negligence.  In interpreting such clauses
> we listed as guiding standards that: 1) the contract language
> must be construed strictly, since exculpatory language is not
> favored by the law; 2) the contract must state the intention of
> the parties with the greatest particularity, beyond doubt by
> express stipulation, and no inference from words of general
> import can establish the intent of the parties; 3) the language
> of the contract must be construed, in cases of ambiguity,
> against the party seeking immunity from liability; and 4) the
> burden of establishing the immunity is upon the party
> invoking protection under the clause.  Dilks, at 434 . . . .

Topp Copy Products, Inc. v. Singletary, 533 Pa. 468, 471 (1993).

In this instance, the intention of the parties to exculpate Ginko from

liability for its own negligence was not clearly expressed.  The lease and lease addendum

were executed on the same day.  The lease was clearly modified to render the lessor liable

for negligence.  The purported exculpatory provision in the lease addendum is contained

only in a section concerning the lessee's obligation to obtain insurance.  And the required

insurance coverage was limited to the damages to "personal property, equipment, fixtures

and leasehold improvements."  As debtor's counsel conceded at the trial, damages due to

the interruption of business operations were not addressed in section 10 of the addendum.

Given the provisions of section 11 of the lease, and the limited scope of

damages found in section 10 of the addendum, as well as section 10 only placing a duty upon the lessee to obtain certain insurance, I cannot conclude that it is clear from two contracts executed on the same day that the parties intended to absolve the lessor from all liability for its own negligence. See generally Schnee v. Springwood Gardens, Inc., 38 Pa. D. & C.2d 248 (Pa. Com. Pl. 1965). And, to the extent the agreements are ambiguous, they should be construed against Ginko as the drafter. See Rusiski v. Pribonic, 511 Pa. 383, 390 (1986); Fleetway Leasing Co. v. Wright, 697 A.2d 1000, 1003 (Pa. Super. 1997) (noting "the rule of construction that an ambiguous lease must be construed against the drafter").

Accordingly, Pennsylvania law would not construe the various agreements as absolving Ginko from all liability for its negligence. Less clear, however, is whether section 10 of the addendum affects any subrogation claim by the insurance carrier, Regis. That is, whether the various agreements absolve Ginko from liability for any property damage incurred by the lessee and covered by the requisite insurance, and, if so, whether Regis can look to the lessor for reimbursement. That issue is not, however, before me, as the insurance company was not involved in the liability trial. The parties may raise this issue at the trial on damages, as well as any other issues concerning the assessment of damages under Pennsylvania law.

An appropriate order shall be entered.

26