UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :    Chapter 11

GINKO ASSOCIATES, L.P.                   :

            Debtor                       :    Bankruptcy No. 05-19436bf

.................................................

MEMORANDUM

.................................................

Before me is the debtor's amended objection to an amended proof of claim,
docketed as claim #8, filed by Mr. Luan Tota, t/a Branzino Restaurant.  Mr. Tota, the
owner and operator of Branzino Restaurant, asserts an unsecured claim totaling
$225,601.15, see Claimant's Post-Trial Memorandum, at 2, 40, in connection with a lease
from debtor Ginko Associates, L.P. of commercial real estate located at 259-61 South
17th Street, Philadelphia, Pennsylvania.[1]  In his amended claim, Mr. Tota seeks damages
against Ginko for pre-opening repairs made by him, repairs made to the basement to
prevent flooding, and repairs made in connection with damages caused by a burst water
pipe, as well as attorney's fees, return of his security deposit, and damages for delay in
opening the restaurant.  The debtor objects to the amended claim, opposes any return of

---

[1]At the final hearing on this matter, Mr. Tota moved to conform the pleadings to
the evidence, including the amounts claimed differing from those in the filed amended claim.  3
N.T. at 68-69.  This is permissible per Fed. R. Civ. P. 15(b)(2), incorporated in bankruptcy
proceedings by Fed. R. Bankr. P. 7015, which itself can be incorporated into contested matters
under Fed. R. Bankr. P. 9014(c).  See, e.g., In re Adelphia Communications Corp., 376 B.R. 87,
106 (Bankr. S.D.N.Y. 2007).  I granted the motion.  3 N.T. at 69.
        The hearing on damages took place over three days.  Citations to Notes of
Testimony will be in the form of  "1 N.T. at"; "2 N.T. at"; and "3 N.T. at."

the tenant's security deposit, and counters with its own claim for unpaid rent and other charges.

Previously, I bifurcated the matter to first determine the liability, if any, of Ginko.  In a memorandum and order issued July 25, 2007, see In re Ginko Assocs., L.P., 372 B.R. 229 (Bankr. E.D. Pa. 2007), I found Ginko liable for those certain pre-opening repairs and improvements performed by Mr. Tota and for the cost of repairs to prevent flooding of the basement storage area.  I disallowed, however, the creditor's claim for attorney's fees as well as damages for the purported delay in opening the restaurant.  In addition, I deferred to this second, damages portion of the contested matter the issues of Mr. Tota's claim for return of his security deposit, and Ginko's setoff claim, as well as liability for that portion of the claim concerning property damages, damages for business interruption, and subrogation, all arising from the burst water pipe.

In the July 2007 memorandum I noted potentially conflicting provisions in the Lease Agreement and Lease Addendum regarding the lessor's liability for negligence, but deferred decision on that issue to accord intervenor Regis Insurance Company, Mr. Tota's insurance carrier, the opportunity to participate.[2]  In this phase of the dispute, the parties still disagree as to whether the lease agreements as a whole place liability on Ginko for its negligence, or if recovery from Ginko is precluded by an exculpation clause.

The following facts are relevant to this claim and are detailed in narrative format.

---

[2]On February 15, 2007, Regis filed a motion to intervene in this claim objection, asserting a right of subrogation of Mr. Tota's claim against Ginko.  On March 29, 2007, Regis's intervention motion was granted with agreement of the parties, and the insurance carrier was permitted to intervene in the damage aspect of the dispute.

2

I.

The debtor, Ginko Associates, L.P., was the owner of property located at 259-261 South 17th Street, Philadelphia, Pennsylvania.[3]  On January 9, 2002, Ginko entered into a Lease Agreement with Mr. Muharrem Himallari (a/k/a, and hereinafter, Mario Hima), Mr. Tota's cousin, for rental of the premises, consisting of a portion of the first floor of the building at 259 South 17th Street and the first floor and basement of the building at 261 South 17th Street.  Ex. C-1.  (The upper floors of the buildings were vacant and not part of the leased space.)  Signed contemporaneously with the lease was a Lease Addendum.  See ex. C-2.  I previously found that Ginko drafted both of these documents.  See In re Ginko, 372 B.R. at 237.

Mr. Hima and Mr. Tota are both citizens of Albania who came to this country in the late 1990s.  Before Mr. Hima was able to open a restaurant at the 17th Street location, he was deported back to Albania.  He and Mr. Tota then agreed that Mr. Tota, who was seeking rental space for his own restaurant, would take over the 17th Street leasehold.

Accordingly, on May 1, 2003, Mr. Tota, Mr. Hima, and Ginko entered into an agreement termed a "Lease Modification Agreement" adding Mr. Tota to the Lease Agreement as lessee under the lease as of that date.  Ex. C-3, § 1.  This modification

---

[3]The premises were sold on June 8, 2006 to PBRG Acquisitions, LP and the lease assigned to this new owner.  See May 17, 2006 Order (docket #181).  For purposes of this claim objection, the parties agreed that Ginko was the owner and lessor of the subject property.

Furthermore, the debtor's confirmed plan provides that allowed claims of unsecured creditors will be paid in full.  See "Second Modified Second Amended Plan," dated May 11, 2006, Article III, ¶ 3.5.  Thus, any allowance of Mr. Tota's claim will be paid in full by Ginko.

agreement also "ratified" all of the terms of the January 2002 lease.  Ex. C-3, § 5.[4]  When

it was clear that Mr. Hima would not be permitted to return to this country, Mr. Tota took

over full ownership of the restaurant.

The January 2002 Lease Addendum called for a five year lease term, with

base rental payments during the first twelve months of $3,500 monthly.  Ex. C-2, at § 2.

The rent increased annually as follows:

| lease year | monthly rent |
|---|---|
| 1 | 3,500.00 |
| 2 | 3,710.00 |
| 3 | 3,932.60 |
| 4 | 4,168.56 |
| 5 | 4,418.67 |

Id.

The Lease Addendum also required the lessee to pay "as additional rent,

Lessee's proportionate share of the Business Use and Occupancy Taxes, or similar taxes

imposed and/or assessed by the School District and/or City of Philadelphia . . . ."  Id., § 4.

Additionally, the lessee was required to pay:

> as additional rent, an amount equal to twenty-five (25%)
> percent of the aggregate of all real estate, assessments, special
> services district taxes . . . within ten (10) days of presentation
> of a bill for such taxes.  Lessee's share of the Real Estate
> Taxes shall be pro-rated during the first and last calendar
> years during the term of this Lease on a per diem basis.
> Should Lessee fail to pay such taxes in a timely manner,
> Lessee shall also be responsible for any and all interest,
> penalties and additions that may be imposed or assessed by
> the City and/or School District of Philadelphia.

---

[4]While the Modification Agreement did not expressly mention the Lease
Addendum, the parties assumed that the reference in the Modification to the January 2002 lease
included the Addendum as well.  I agreed that this was the intent of the parties, especially since
many of the specific lease terms are only found in the Addendum and the lease refers to the Lease
Addendum.  See In re Ginko, 372 B.R. at 234 n.4.

4

Id., § 6.  Similarly, the lessee was required under the Lease Addendum to pay "as additional rent, twenty-five (25%) percent of all water and sewer charges that are assessed or imposed upon the entire premises . . . within ten (10) days after presentation of a bill therefor by Lessor.  If Lessee shall fail to make timely payment . . . Lessee shall also be responsible for any interest, penalties and additions imposed thereon."  Id., § 5.  Thus payment of the water and sewer charges, and taxes (other than use and occupancy and school taxes) required prior presentment of a bill by Ginko.

The Lease Addendum provided for the payment of rent on the first day of the month, with a late charge of 5% of the "amount of such item of rent, additional rent or other charge due" if not paid within 10 days of the due date.  Id., § 2.  In addition, the lessee was to pay the lessor an administrative charge of $50 for any of lessee's checks that were returned due to insufficient funds or otherwise dishonored.  Id.  However, the Lease Addendum required that "[p]rior to the exercise of any remedies by Lessor hereunder, Lessor shall provide: (a) five (5) days written notice for monetary defaults; and twenty (20) days in cases of non-monetary defaults . . . ."  Id., § 24.

After he signed the lease modification in May 2003, Mr. Tota prepared the leasehold for use as a restaurant, leading to the claim that Ginko owes him for rent credits promised by its property manager, Mr. Whit Garrett,[5] as reimbursement for repairs or improvements made by him that were the contractual responsibility of the lessor or otherwise authorized by the lessor's agent.  In the initial phase of this contested matter, I

---

[5]Mr. Garrett worked for Urban Shelter, a company controlled by Wilson Rigdon, president of the general partner of Ginko.  Later, Walter Wood Realty took over management of the Ginko properties.  There is no dispute that, at the times relevant, Mr. Garrett was a duly authorized agent of the lessor.

5

found Ginko liable for these credits.  In re Ginko Assocs., L.P., 372 B.R. at 239-40.  The

specifics of these repairs and their costs will be discussed below.

Mr. Tota opened the restaurant on October 2, 2003.  1 N.T. at 71.  The

restaurant includes two dining areas, one containing 45 seats (259 South 17th St.) and one

containing 25 seats (261 South 17th St.).  3 N.T. at 18-20.  The restaurant is open 52

weeks a year, even when Mr. Tota is on vacation.  2 N.T. at 122, 123.  Mr. Tota testified

that in 2004 he filled all of the tables on "many, many nights."  3 N.T. at 19.  He testified

that in 2005, he did 450-550 "covers" per week, and in 2007 he averaged 550-650.  2

N.T. at 109-110.  He also testified that the average cost of a meal ($30) has remained

constant.  Id.

On January 26, 2005, a water pipe located on the unheated, non-leased

second floor of the premises froze and broke, flooding the restaurant, basement and

storage areas.  At the liability phase of the contested matter, Ginko admitted that the water

pipe breakage was due to its negligence.  In re Ginko Assocs., L.P., 372 B.R. at 241.

Among other things, the flood damaged the restaurant's ceiling and walls,

rugs and furniture, and a wall mural.  Damage occurred in both dining rooms of the

restaurant, but primarily in the 45-seat dining room.  2 N.T. at 72.  Mr. Tota notified

Ginko's management company, Walter Wood Realty, as well as his own insurance

company, Regis.  2 N.T. at 97-98.

Mr. Tota then hired a company called ServPro Restoration to remove the

water from the premises.  2 N.T. at 98; see ex. C-26 (ServPro invoice dated February 8,

2005 listing claim date as February 4, 2005).  He testified that ServPro installed

dehumidifiers that ran for approximately two weeks.  2 N.T. at 98.  On February 8, 2005,

Mr. Tota engaged a property appraiser, Mr. Bruno Pagano, of Pro-Claim Public

Adjusters, Inc., to negotiate with Regis on his behalf.  2 N.T. at 4-6, 105.

Although Mr. Tota variously referred to the restaurant being closed for 35

days after the burst water pipe, see, e.g., Claimant's Post-Trial Memorandum, at 17, ¶ 88

("the restaurant was closed for 35 days from 1/26/05 to 3/2/05"), it appears that only a

portion of the restaurant was closed from January 26, 2005 to March 2, 2005 to make

repairs sufficient to reopen the business fully.  See 2 N.T. at 29 (testimony of Mr. Pagano

that "the actual work started 2/9/2005 and ended on 3/2/2005 . . . and there was

suspension of service in part of the restaurant during that time."); 2 N.T. at 105

(testimony of Mr. Tota that he closed "part" of the restaurant for 35 days and that work on

the restaurant occurred from February 9, 2005 to March 2, 2005); 2 N.T. at 90-91 (Mr.

Pagano testifying that the restaurant was closed for 35 days and would be partially closed

in the future, but then stating that there was "some business going on," possibly 30%,

during the 35-day closure).  During this period, various contractors performed repairs, and

Mr. Tota did some work himself.  See 2 N.T. at 103.

Mr. Tota ultimately filed a claim with Regis to recover his repair costs

during that period, plus a loss of 70% of business, and also claimed damages for projected

future repairs as well as anticipated loss of business while these future repairs were

completed.  Ex. C-39.  See also 2 N.T. at 29 (Mr. Pagano testifying that the accountant

calculated initial loss of earnings based on a 70% loss).  In connection with the personal

property damages, Mr. Tota executed a Sworn Statement in Proof of Loss on January 16,

2005, claiming from Regis a total of $32,500 as the replacement cost to betterments,

improvements and business personal property as a result of the water damage.  Ex. I-1(g).

Additionally, Mr. Pagano sent a letter dated January 13, 2006 to Regis, stating:

> This letter is to memorialize our telephone conversation . . with regards to the loss of 1/26/2005 with Bronzino [sic] Restaurant.  At the time we arrived at a gentleman's agreement to settle in full the betterments and improvements business personal property for $32,500 pending a proof of loss.
>
> Subsequently this offer was presented to your insured Luan Tota, and was accepted in good faith.
>
> Therefore this leaves open only the issue concerning the business interruption.

Ex. I-4 (emphasis in original).

On January 19, 2006, Mr. Pagano requested a loss of business estimate from Nick Marinelli, an accountant hired by Mr. Tota to compute the loss of business, see 1 N.T. at 8-10; 2 N.T. at 88, assuming 35 days loss of earnings, plus six weeks future loss of earnings, both based on a 70% reduction in restaurant operations.  Ex. C-39.[6]  Mr. Tota executed another Sworn Statement in Proof of Loss on February 1, 2007, claiming from Regis a total of $21,550.42 for the loss of business resulting from the water damage.  Ex. I-1(f).

Regis paid Mr. Tota $31,500.00 for personal property damage[7] and $21,550.42 for loss of business profits.  Trial Stipulation, at ¶ 2.  Payments were made by

---

[6]Mr. Marinelli, the debtor's lost profits expert, filed a motion to quash the trial subpoena, declining to testify unless he was paid.  The debtor declined to pay an expert fee; therefore the witness did not testify.  See 1 N.T. at 8-12.  Because this witness was not deemed unavailable, his deposition was not admitted into evidence.  See 1 N.T. at 13-18.

[7]The insurance policy provided for a $1,000 deductible.  See Ex. I-1(A) (unpaginated); 2 N.T. at 88.

8

Regis by bank drafts dated January 26, 2005 ($7,500.00), January 16, 2006 ($24,000.00),

August 21, 2006 ($4,584.42 for 35 days lost profit), and February 5, 2007 ($16,966.00 for

six weeks lost profit).  Id., at ¶ 4.

      Mr. Tota contends in this contested matter that these amounts did not fully

compensate him for his losses.  Claimant's Post-Trial Memorandum, ¶¶ 91-92; see 2 N.T.

at 74-75 (Mr. Pagano testifying that amount received on betterments and improvements

and personal property damage represented a compromise with Regis).  Further, although

he negotiated with Regis for lost profits in the future based on a partial closure of the

business, see 2 N.T. at 90, he contends in this proceeding that a full closure is necessary.

2 N.T. at 92.

      The parties dispute the application and interpretation of various provisions

of the Lease and the Lease Addendum, especially concerning the issue of liability for the

damages caused by the burst water pipe.  The Lease at section 11 provides:

> (a) Lessee agrees to be responsible for and to relieve and
> hereby relieves the Lessor from all liability by reason of any
> injury or damage to any person or property in the demised
> premises, whether belonging to the Lessee or any other
> person, caused by any fire, breakage or leakage in any part or
> portion of the demised premises, or any part or portion of the
> building of which the demised premises is a part, or from
> water, rain or snow that may leak into, issue or flow from any
> part of the said premises, or of the building of which the
> demised premises is a part, or from the drains, pipes, or
> plumbing work of the same, or from any place or quarter,
> *unless* such breakage, leakage, injury or damage be caused by
> or result from the negligence of Lessor or his servants or
> agents or any person or persons whatsoever.

Ex. C-1, § 11(a) (emphasis supplied).  The word "unless" replaced the form's original

word, "whether."  Id.

      The next paragraph is similarly altered as follows:

(b) Lessee also agrees to be responsible for and to relieve and hereby relieves the Lessor from all liability by reason of any damage or injury to any person or thing, which arise from or be due to the use, misuse or abuse of all or any of the elevators, hatches, openings, stairways, hallways, of any kind whatsoever, which may exist or hereafter be erected or constructed on the said premises, or from any kind of injury which may arise from any other cause whatsoever on the said premises or the building of which the demised premises is a part *unless* such damage, injury, use, misuse or abuse be caused by or result from the negligence of Lessor, his servants or agents or any other person or persons whatsoever.

Ex. C-1, § 11(b) (emphasis supplied).

Section 12 of the Lease deals with the responsibility of the lessor in case of total or partial destruction to the premises, as follows:

(a) In the event that the demised premises is totally destroyed or so damaged by fire or other casualty not occurring through fault or negligence of the Lessee or those employed by or acting for him, that the same cannot be repaired or restored within a reasonable time, this lease shall absolutely cease and determine, and the rent shall abate for the balance of the term.

(b) If the damage caused as above be only partial and such that the premises can be restored to their then condition within a reasonable time, the Lessor may, at his option, restore the same with reasonable promptness, reserving the right to enter upon the demised premises for that purpose. The Lessor also reserves the right to enter upon the demised premises whenever necessary to repair damage caused by fire or other casualty to the building of which the demised premises is a part, even though the effect of such entry be to render the demised premises or a part thereof untenantable. In either event the rent shall be apportioned and suspended during the time the Lessor is in possession, taking into account the proportion of the demised premises rendered untenantable and the duration of the Lessor's possession. If a dispute arises as to the amount of rent due under this clause, Lessee agrees to pay the full amount claimed by Lessor. Lessee shall, however, have the right to proceed by law to recover the excess payment, if any.

10

(c) Lessor shall make such election to repair the premises or terminate this lease by giving notice thereof to Lessee at the leased premises within thirty days from the day Lessor received notice that the demised premises had been destroyed or damaged by fire or other casualty.

(d) Lessor shall not be liable for any damage, compensation or claim by reason of inconvenience or annoyance arising from the necessity of repairing any portion of the building, the interruption in the use of the premises, or the termination of this lease by reason of the destruction of the premises.

Ex. C-1, § 12.

In addition, three paragraphs of section 4 of the Lease Agreement are deleted in their entirety, one having to do with payment of taxes, one with payment of water rent, and one with sewer rent. See ex. C-1, § 4(b), (d) and (e). The third paragraph of section 4, requiring the lessee to pay as additional rent all increases in fire insurance premiums, is not struck. See ex. C-1, § 4(c).

As for the Lease Addendum, it requires the lessee to obtain insurance coverage in paragraph 10, as follows:

LESSEE'S INSURANCE. Lessee shall, at Lessee's sole cost and expense, obtain and maintain throughout the term of this Lease and any extensions or renewals, a policy of comprehensive general public liability insurance, including contractual liability and fire legal liability coverages, insuring both Lessee and Lessor, in and about the demised premises, with combined single limits of not less than One Million ($1,000,000.00) Dollars for bodily or personal injury or death per person and property damage. In the event that Lessee shall obtain a liquor license for use at the demised premises, Lessee shall also maintain dram shop or liquor liability insurance coverage. Lessor shall be named as an additional insured on said policy(ies), and such policy(ies) shall not be subject to cancellation, termination or change except after at least twenty (20) days prior written notice has been given to Lessor. The policy(ies) of insurance shall be issued by a financially responsible company or companies licensed to do business in the Commonwealth of Pennsylvania.

11

Upon execution of this Lease and prior to Lessee taking possession of the demised premises, Lessee shall deliver to Lessor a copy of said insurance policy(ies) or a Certificate of Insurance evidencing said coverage and shall provide proof of payment of the premiums therefor.  Prior to the expiration date of such policy, Lessee shall provide Lessor with a copy of all renewal or replacement policies or Certificates of Insurance therefor, indicating that the required insurance coverage is in force and effect at all times during the term of this Lease and any extensions or renewals hereof.  Lessee acknowledges and agrees that Lessor shall not be responsible or liable in any way to Lessee or any other person, for any damage or loss to any personal property, equipment, fixtures and/or leasehold improvements of Lessee or any other person upon the demised premises.  Lessee agrees to maintain throughout the term of this Lease and any extensions or renewals, a policy of fire and hazard insurance covering all of Lessee's contents and leasehold improvements at the demised premises at the replacement value thereof.

If Lessee shall fail to obtain or maintain such insurance policy or coverages required hereunder, Lessor may, but shall not be obligated to, obtain such insurance coverages on Lessee's behalf, or Lessor may, at its sole option, terminate this Lease upon ten (10) days notice to Lessee.  In the event that Lessor obtains such coverages on Lessee's behalf, Lessee shall reimburse Lessor for the cost of the premiums, together with a service charge in the amount of 1-1/2% per month upon such costs paid by Lessor, until Lessee shall have fully reimbursed Lessor for same.

Ex. C-2, at ¶ 10.

In addition, the Lease Addendum provides for indemnification by the lessee

as follows:

INDEMNIFICATION.  Lessee agrees to indemnify, defend and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, losses, liabilities, damages, costs and expenses, including attorney's fees and disbursements, arising out of or flowing from the operation of Lessee's business and/or the use and occupancy of the demised premises, and/or from any bodily injury or property damage or loss sustained by Lessee or any of Lessee's employees,

12

> agents, patrons or invitees upon the premises, and/or from a
> breach of this Lease by Lessee.

Ex. C-2, at § 14.

Finally, as Ginko points out, the Lease Addendum begins with the

following preface:

> Notwithstanding anything set forth in the pre-printed Lease
> Agreement to the contrary, the parties hereto, intending to be
> legally bound hereby, do agree as follows. . . .

Ex. C-2.

As for Regis' subrogation rights, I note that neither the Lease Agreement

nor the Lease Addendum expressly addresses subrogation rights using that term or title,

except the indemnification provision just quoted that protects the lessor.  The insurance

policy between Regis and Mr. Tota includes an "SMP [Special Multi-Peril Policy]

Amendatory Endorsement" addressing subrogation.  This endorsement provides:

> 1.6. Subrogation.
>
> (a) In the event of any payment under this policy, the
> Company shall be subrogated to all the insured's rights of
> recovery against any person. . . .
>
> (c) As respects coverage provided under Section 1-Property
> Coverage of this policy this insurance shall not be invalidated
> should the insured waive in writing any or all right of
> recovery against any party for loss. . .  subject to the
> following additional provisions:
> ***
> (2) If made before loss has occurred, such agreement
> may run in favor of any third party.

Trial Stipulation, Ex. I-1(A) (unpaginated).

In support of his claim for lost profits during the 2005 closure immediately

after the water pipe burst, Mr. Tota submitted his 2003, 2004 and 2005 tax returns for

restaurant operations.  See exs. C-45 and C-46.  For the anticipated future closing for completing repairs and restoration, Mr. Tota testified to the 2007 restaurant income and expenses.  See 2 N.T. 132-138.  A comparison of all of these figures follows:

|  | 2004 | 2005 | 2007 |
|---|---|---|---|
| **INCOME** |  |  |  |
| gross receipts or sales | 402,582 | 493,216 | 780,000[8] |
| cost of goods | 166,767 | 210,324 | 195,000[9] |
| **GROSS PROFIT** | 235,815[10] | 282,892 | 585,000 |
|  |  |  |  |
| **EXPENSES**[11] |  |  |  |
| payroll | 83,625 | 47,215 | 180,000-240,000 |
| rent | 40,612 | 44,733 | 50,400 |
| advertising | 3,248 | 2,744 | 8,400 |
| interest | 151 | 79 | none in 2007 |
| taxes & licenses | 8,926 | 24,716 | 1,200 |
| depreciation | 13,786 | 10,895 | unknown |
| heat and light | 20,974 | 21,986 | 30,000 |
| equipment rental | 3,602 | 324 | 12,000-18,000 |
| equipment maintenance |  | 1,586 | 12,000 |

[8]Mr. Tota testified that the average monthly gross revenue for January 2007-July 2007 was $65,000.  2 N.T. at 132.

[9]Mr. Tota testified that his cost of goods is approximately 25% of the gross monthly receipts.  2 N.T. at 126.

[10]This total does not include the $171 in income derived from sales tax commissions.

[11]The categorization and order of listing expenses for the most part follows the 2005 tax return form 1120 and its attached schedule of deductions.

14

| | | | |
|---|---:|---:|---:|
| credit card fees | | 3,738 | 18,000-21,600 |
| laundry | 9,476 | 9,893 | 12,000 |
| store supplies & expenses | 4,192 | 11,183 | 6,000-9,600 |
| building maintenance | 9,310 | 14,924 | |
| trash removal | 3,575 | 2,636 | 3,360 |
| customer parking | 3,661 | 6,678 | 6,000 |
| outside services | 1,200 | 9,466 | none in 2007 |
| insurance | 6,878 | 6,449 | 7,000 |
| employee benefits | 5,347 | 8,384 | 10,400 |
| travel expense | 32 | 41 | none in 2007 |
| office supplies and expense | 1,952 | 8,241 | unknown |
| telephone | 2,120 | 2,912 | 3,000 |
| bank fees | 1,855 | 65 | 600 |
| professional services | 2,750 | 30,425 | |
| amortization | 433 | 443 | |
| water | | | 2,160 |
| miscellaneous | 1,293 | | |
| postage | 207 | | |
| uniforms | 318 | | |
| payroll services | 852 | | unknown |
| | | | |
| **TOTAL EXPENSES** | 230,375 | 269,129 | 361,720-434,920 |
| **NET PROFIT** | 5,440 | 13,763 | 223,280-150,080 |

      Mr. Tota testified that he would not have laundry, store supply, customer parking, travel, interest, or office supply expenses during a closure.  2 N.T. at 111, 114, 115, 116, 133, 136.  He also stated that during a closure he would not pay as much for

heat and light or for credit card charges.  2 N.T. at 112.  He asserted that those saved
expenditures totaled $2,866.69 in 2005 and would subtract $1,500 per month from his
expenses in 2007.  Claimant's Post-Trial Memorandum, ¶ 113.

   Mr. Tota's testimony regarding 2007 income and expenses was uncertain or
conflicting in some respects.  For example, he could not give an estimate of how much he
had spent on office supplies and expenses, or the amount of claimed depreciation on
personal property.  2 N.T. at 117, 136.  When asked about the cost of trash removal, he
first stated "I don't know on top of my head[,]" 2 N.T. at 114, but later answered "$280 a
month."  2 N.T. at 134.  Similarly, he stated that salaries cost him 30 percent of his gross
profit, 2 N.T. at 125—which would equal roughly $234,000 for 2007 ($19,500
monthly)—but later stated that salaries cost him $15,000-20,000 ($180,000-$240,000
annually).  2 N.T. at 133.  He also stated that he did not know the income and expenses
for August and September 2007 because he was on vacation then.  2 N.T. at 130-131.
Finally, he stated that there were other expenses, but he could not name them.  2 N.T. 137
("I have to take a moment and, you know, think about them.").

   In addition, some of Mr. Tota's estimates regarding 2007 income and
expenses were at variance with 2004 and 2005 figures, without any explanation.  Mr.
Tota estimated that net profit equaled 15-18 percent of his gross profit in 2007, 2 N.T. at
137, but the numbers above show a 25-39 percent profit ($150,080 or $223,280 divided
by $585,000), and he averaged only 2-3 percent net to gross profit in 2004 and 2005.  He
also estimated that in 2007 his cost of goods approximated 20-25 percent of his gross
receipts, 2 N.T. at 109, 110, 125, or less, id. at 111, but his 2005 cost of goods

16

approximated 43 percent, and his 2004 cost of goods approximated 42 percent.  See exs.
C-45, C-46.

This uncertainty occurred despite Mr. Tota's testifying that "I don't need an
expert to tell me my numbers, you know, what – what do I do, because I know what I do.
I'm not an accountant, but everything in that restaurant goes through my fingers.  The
cash money, the charge money, you know, expenses such as, you know, food costs, labor,
other expenses, you know.  I do them myself, not my accountant.  So, you know, I don't
need a[n] expert to tell me that."  2 N.T. at 127.  In contrast, later he stated "If – I mean, if
you need a[n] exact answer from me, I mean, I have to, you know, I have to take my
paperwork.  I mean, I'm not a computer, you know.  I know what my numbers are and I
know what I do every week.  But if you need exact the amount what I do monthly, I have
to – I have to take my paperwork with me."  2 N.T. at 131.

In support of his claim against the lessor for future repair and renovation
costs and lost profits, Mr. Tota presented the testimony of Mr. Howard Ozeroff, who was
qualified as an expert to offer an opinion as to the extent and cost of damages.  1 N.T. at
112.  Mr. Ozeroff had been retained by Mr. Pagano to provide an estimate of the work to
repair the betterments and improvements.  1 N.T. at 122.  Mr. Ozeroff examined the
damages to the restaurant in July 2005, 1 N.T. at 123, thus some months after the burst
pipe and after the restaurant had been partially repaired.  He estimated what it would cost
"to bring it back to like it was prior to the leak.  Not improve what was there, but like
kind and quality, as close as possible."  1 N.T. at 119.

Mr. Tota submitted into evidence an estimate prepared by Mr. Ozeroff,
under a cover letter dated July 12, 2005, detailing the additional work required to repair

17

betterments and improvements at the restaurant.  Ex. C-32.  This report includes repairs in

the north front and rear areas, the service hall, and the south front area.  Id.

Recommended repairs include cleaning and painting ceilings, repairing various light

fixtures, and replacing the carpet.  Id.; 1 N.T. at 114.  Mr. Ozeroff estimated a cost of

$34,628.05 to complete the repairs.  Ex. C-32.  The items Mr. Tota had already repaired,

such as the wall mural, and some painting and patch work, were not included in Mr.

Ozeroff's estimate.  3 N.T. at 21-22.

By letter dated July 13, 2005 to Mr. Pagano, Mr. Ozeroff estimated that the

time of repair would be two months.  Ex. C-34.  Mr. Ozeroff testified however that his

estimate of time was, more accurately, seven weeks.  1 N.T. at 116.  "I just wrote it up

roughly and I had 7 weeks, and I think in my letter I put 8 weeks."  Id.  He explained on

direct testimony why his estimate anticipated complete closing of the restaurant for the

entire time of the repairs as follows:

> [A] restaurant like that, that serves the type of food . . . no one
> wants to go in there with a junky looking place with plastic
> hanging all over and dust and everything else.
>
> He'd have to vacuum that place from top to bottom every
> night and it would still look a mess.  Your cost would be more
> prohibitive to do that job in stages.  Put the carpet in on the
> north side, and then bring them back when the south side is
> ready.
>
> Same thing with the painter.  Finish up one side, and you do it
> the following two weeks later and hopefully that he could
> come in and do the job for you when you need him.  That's
> why it's time consuming.

1 N.T. at 116-17.

Finally, Mr. Tota asserts that Ginko is responsible to return his lease security deposit to him having transferred ownership of the leasehold and assigning the lease.  The Lease Agreement provides the following regarding the security deposit:

> Lessee shall, upon execution hereof, deposit with Lessor as security for the performance of all the terms, covenants, and condition of this lease, the sum of SEE ADDENDUM.  This deposit is to be retained by Lessor until the expiration of this lease and shall be returnable to Lessee provided that (1) premises have been vacated; (2) Lessor shall have inspected the premises after such vacation; and (3) Lessee shall have complied with all the terms, covenants and conditions of this lease, in which event the deposit so paid hereunder shall be returned to Lessee; otherwise, said sum deposited hereunder or any part thereof may be retained by Lessor at his option, as liquidated damages, or may be applied by Lessor against any actual loss, damage or injury chargeable to Lessee hereunder or otherwise, if Lessor determines that such loss, damage or injury exceeds said sum deposited.  Lessor's determination of the amount, if any, to be returned to Lessee shall be final.  It is understood that the said deposit is not to be considered as the last rental due under the lease.

Ex. C-1, § 28 (emphasis in original).

> The Lease Addendum additionally provides, in pertinent part:

> As security for Lessee's faithful performance of all of its covenants and agreements under this Lease, Lessee agrees to deposit with Lessor a security deposit in the amount of Seven Thousand ($7,000.00) Dollars, upon execution of this Lease. . . .  In the event of a default by Lessee, which shall remain uncured after any required notice and opportunity to cure, Lessor may (but shall not be obligated to) apply the security deposit toward any damage Lessor may suffer from such default . . . .  Lessor may deliver the security deposit to any purchaser of Lessor's interest in the demised premises in the event that such interest is sold, and thereupon Lessor shall be discharged from any further liability with respect to such security deposit and Lessee shall look solely to the transferee of such security deposit for the return thereof.

Ex. C-2, § 15.

19

Ginko seeks to offset Mr. Tota's amended proof of claim by its own claim for unpaid rent and other charges. In support, Ginko submitted into evidence two ledgers prepared by Walter M. Wood, Jr., Inc. as property manager. The first, dated September 30, 2007, purports to list all charges assessed against Branzino Restaurant, amounts paid, and a rolling balance, beginning November 16, 2001 and ending July 7, 2006. See ex. D-1. The second ledger, dated July 12, 2006, lists only outstanding payments owed, from January 31, 2002 through June 11, 2006. See ex. D-2. Both ledgers report that $14,680.05 remains due.[12]

The first ledger shows a payment on November 16, 2001 of $3,500 by check ascribed to the security deposit, and a payment of $3,000 cash on January 7, 2002. Ex. D-1. These entries are followed by an entry dated January 31, 2002 charging $7,000 for "deposit." Id. The second ledger includes an entry dated January 31, 2002 of $500 still due for "deposit." Ex. D-2.

In addition, Ginko submitted a letter dated December 19, 2005 from Glenn F. Hing, Esq., its attorney, addressed to Mr. Hima, advising him of his failure to pay certain real estate taxes ($5,121.65), Center City district taxes ($534.98), use and occupancy taxes ($1,451), and water and sewer charges ($1,715.08), totaling $8,819.71. Ex. C-14. Dr. Rigdon, who is affiliated with Ginko, testified that these figures were supplied by him. 3 N.T. at 88. Mr. Tota entered into a payment plan to pay $1,000 per

---

[12]Despite ending up with the same amount due, the ledgers do not match in their listings of charges due. This also results in the running balances of amounts outstanding to not correspond. For example, on February 28, 2004, exhibit D-1 shows $6,046.53 owing, while exhibit D-2 shows $2,649.37 owing. As exhibit D-1 was prepared September 30, 2007 and exhibit D-2 was prepared July 12, 2006, I will favor the numbers presented on exhibit D-1 as the more recent accounting and more accurate representation of Ginko's offset claim.

20

month, as supported by a confirming letter dated January 10, 2006, sent by his attorney,

John Gough, Esq., to Mr. Hing.  See ex. C-15.  Mr. Tota ultimately paid $4,715.08 under

this agreement.  Ex. C-49.

The parties also dispute the propriety of the assessment of late fees on

several rent payments as represented on the ledgers.  These rent payments were made on

December 5, 2005 and January 5, February 3, March 6, April 5, May 2, and June 2, 2006,

all in the amount of $3,932.60.  Ex. D-1.  Dr. Rigdon conceded at trial that late fees were

to be assessed for payments made more than 10 days late, not five days.  3 N.T. at 88-89.

However, he asserted that if the rent was delinquent and never brought current, a late fee

would be assessed on each month as a rolling charge.  3 N.T. at 90.

Regarding late fees, the Lease Addendum provides the following:

> Prior to the exercise of any remedies by Lessor hereunder,
> Lessor shall provide: (a) five (5) days written notice for
> monetary defaults; and (b) twenty (20) days in cases of non-
> monetary defaults . . . .

Exhibit C-2, § 24.

Aside from rent checks, it appears that Ginko applied checks received from

Mr. Tota to particular debts, rather than to a running total.  For example, Ginko's ledger

at April 16, 2004 notes $117.14 due on a water bill.  Ex. D-1.  The check received May

25, 2004 for $117.04 is labeled "water bill."  Similarly, Mr. Tota's checks received on

account of the settlement agreement for back taxes and utilities were applied to that debt.

See, e.g., 12/28/05 check for $1,000 labeled "W&S"; 1/11/06 check for $1,000 labeled

"R.E. tax"; 1/11/06 check for $715.08 labeled "W&S."

Mr. Tota contends that Ginko's ledger lists certain real estate taxes twice.

At February 28, 2005, Ginko lists a total of $2,234.59 due in real estate taxes.  See ex. D-

1.  At January 1, 2006, it claims $1,191.21 and $1,021.04 due in real estate taxes, totaling $2,212.25.  See ex. D-2.

II.

"A proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).  When a claim is based on a writing, the claimant shall attach the original or a duplicate to the filed proof of claim, or explain its loss or destruction. Fed. R. Bankr. P. 3001(c).  Failure to attach a contract to a proof of claim does not defeat the claim; it merely eliminates the entitlement to prima facie validity."  In re Campbell, 336 B.R. 430, 432 (B.A.P. 9th Cir. 2005); In re Moreno, 341 B.R. 813, 817 (Bankr. S.D. Fla. 2006); In re Burkett, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005).

The Third Circuit Court of Appeals has provided instruction upon the appropriate allocation of the evidentiary burdens in proof of claim litigation:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times.  Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is "prima facie" valid.  In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the prima facie case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden

22

> reverts to the claimant to prove the validity of the claim by a
> preponderance of the evidence.  The burden of persuasion is
> always on the claimant.

In re Allegheny Int'l Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) (citations omitted).

Thus, a proof of claim dispute will typically involve shifting evidentiary

burdens with the ultimate burden of persuasion upon the claimant.  In determining

whether that burden has been met, non-bankruptcy law, generally state law, will supply

the substantive law:

> Indeed, we have long recognized that the basic federal rule in
> bankruptcy is that state law governs the substance of claims,
> Congress having generally left the determination of property
> rights in the assets of a bankrupt's estate to state law.

Travelers Cas. & Sur. Co. of Am. v. PG&E, — U.S. —, 127 S. Ct. 1199, 1205, 167 L.

Ed.2d 178 (2007).

As the leasehold is in Philadelphia, and the lease agreements were all

entered into in Philadelphia, Pennsylvania law governs this claims objection.  See J.C.

Penney Co. v. Giant Eagle, Inc., 813 F. Supp. 360, 367 (W.D. Pa. 1992) (all three leases

involved concern Pennsylvania premises and involve installation and operation of a

pharmacy department at that shopping center, and because no other state has a significant

interest in this proceeding, Pennsylvania law applied); see In re Karfakis, 162 B.R. 719,

726 (Bankr. E.D. Pa. 1993) (citing Restatement (Second) Conflict of Laws §§ 6, 188

(1971)).

In determining the meaning of the various lease provisions, I turn to

contract interpretation principles as enunciated by Pennsylvania courts (and followed

when relevant by federal courts).  See Cusamano v. Anthony M. DiLucia, Inc., 281 Pa.

Super. 8, 421 A.2d 1120, 1122 (1980) (leases are contracts thus are controlled by

23

principles of contract law).  "Contracts are best read as a whole and 'clauses seemingly in

conflict [should be] construed, if possible, as consistent with one another.  Terms in one

section of the contract should not be interpreted in a manner which nullifies other terms.'"

Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc., 916 A.2d 686, 692 (Pa. Super.

2007) (quoting AK Steel Corp. v. Viacom, Inc., 835 A.2d 820, 824 (Pa. Super. 2003)

(internal quotation marks and citation omitted).).  The Third Circuit Court of Appeals

observed in this regard:

> In Pennsylvania, [c]ontract interpretation is a question of law
> that requires the court to ascertain and give effect to the intent
> of the contracting parties as embodied in the written
> agreement.  Courts assume that a contract's language is
> chosen carefully and that the parties are mindful of the
> meaning of the language used.  When a writing is clear and
> unequivocal, its meaning must be determined by its contents
> alone.
>
> Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped,
> 886 A.2d 706, 711 (Pa. Cmwlth. 2005) (internal citations and
> quotation marks omitted).
>
> A contract is ambiguous if it is reasonably susceptible of
> different constructions and capable of being understood in
> more than one sense.  The court, as a matter of law,
> determines the existence of an ambiguity and interprets the
> contract whereas the resolution of conflicting parol evidence
> relevant to what the parties intended by the ambiguous
> provision is for the trier of fact.
>
> Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 519 A.2d
> 385, 390 (Pa. 1986) (internal citations omitted).  However,
> "[a]n appellate court may draw its own inferences and arrive
> at its own conclusions when a finding of fact is simply a
> deduction from other facts and the ultimate fact in question is
> purely a result of reasoning."  Id. at 391 n. 6.  A court always
> may consider the course of performance as evidence of the
> intent of the parties.  Atlantic Richfield Co. v. Razumic, 480
> Pa. 366, 390 A.2d 736, 741 n. 6 (Pa. 1978).

In re Old Summit Mfg., LLC, 523 F.3d 134, 137-38 (3d Cir. 2008); see also Warren v.

Greenfield, 407 Pa. Super. 600, 595 A.2d 1308, 1311 (1991) (interpretation of a lease

agreement follows principles of contract interpretation and should give effect to the plain

meaning of the contract as expressing the intent of the parties); Church Mutual Ins. Co. v.

Palmer Const. Co., Inc., 153 Fed. Appx. 805, 808 (3d Cir. 2005).

   The intention of the parties to a contract is gleaned by reference to every

part of the document.  Cusamano v. DiLucia, 421 A.2d at 1122.  Any ambiguities should

be construed against the drafter.  See Rusiski v. Pribonic, 511 Pa. 383, 390, 515 A.2d 507

(1986); Fleetway Leasing Co. v. Wright, 697 A.2d 1000, 1003 (Pa. Super. 1997); In re

Andrews, 78 B.R. 78, 81 (Bankr. E.D. Pa. 1987).  Specific terms control over general

ones, Baltic Development Co. v. Jiffy Enterprises, Inc., 435 Pa. 411, 257 A.2d 541, 543

(1969), and a "clear provision controls a doubtful one[.]"  Cusamano v. DiLucia, 421

A.2d at 1124.  Finally, "according to the usual interpretation of leases, where special

typed matter or addenda are included within a printed lease, insofar as the inserted or

attached matter conflicts with the printed provisions of the lease, the inserted or attached

matter governs."  Scranton Medical Building v. Milkman, 67 Pa. D. & C. 129, 130 (Pa.

Com. Pl. Lack. 1948) (rider attached to lease bound defendant).

   As noted in my July 2007 ruling on liability, Pennsylvania public policy

does not prohibit private parties from including exculpation clauses in their contracts, but

the waiver of liability must be "plainly expressed."  See, e.g., Cannon v. Bresch, 307 Pa.

31, 36, 160 A. 595 (1932).  As explained by the Pennsylvania Supreme Court in a dispute

between a lessor and a lessee also involving water damage caused by a burst pipe:

   It is generally accepted that an exculpatory clause is valid
   where three conditions are met.  First, the clause must not

25

> contravene public policy.  Secondly, the contract must be
> between persons relating entirely to their own private affairs
> and thirdly, each party must be a free bargaining agent to the
> agreement so that the contract is not one of adhesion. . . .  In
> <u>Dilks v. Flohr Chevrolet [Inc.]</u>, 411 Pa. 425 . . . (1963), we
> noted that once an exculpatory clause is determined to be
> valid, it will, nevertheless, still be unenforceable unless the
> language of the parties is clear that a person is being relieved
> of liability for his own acts of negligence.  In interpreting
> such clauses we listed as guiding standards that: 1) the
> contract language must be construed strictly, since
> exculpatory language is not favored by the law; 2) the
> contract must state the intention of the parties with the
> greatest particularity, beyond doubt by express stipulation,
> and no inference from words of general import can establish
> the intent of the parties; 3) the language of the contract must
> be construed, in cases of ambiguity, against the party seeking
> immunity from liability; and 4) the burden of establishing the
> immunity is upon the party invoking protection under the
> clause.  <u>Dilks</u>, at 434. . . .

<u>Topp Copy Products, Inc. v. Singletary</u>, 533 Pa. 468, 471 (1993).

As for Regis's subrogation rights, Pennsylvania law grants to a subrogee the same rights as a subrogor.  <u>Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc.</u>, 916 A.2d at 694 ("subrogee "stands in the shoes of the subrogor").  Thus if Ginko is liable to Mr. Tota, then Regis, to the extent of its valid subrogation claim, can be substituted for Mr. Tota as payee.  <u>Id.</u> (subrogee can recover when its sugrogor has a "legally cognizable cause of action against a third party"); <u>Church Mutual Ins. Co. v. Palmer Const. Co., Inc.</u>, 153 Fed. Appx. 805, 808 (3d Cir. 2005) (non-precedential) ("It is well-established that subrogation is derivative in nature, placing the subrogee in the precise position of the one to whose rights and disability he is subrogated.") (internal citation omitted).  To the extent Mr. Tota has no claim because of a valid exculpation clause, then the subrogee cannot recover from Ginko.  <u>See</u> <u>Jamison v. Ellwood Consol. Water Co.</u>, 420 F.2d 787, 789 (3d

Cir. 1970) ("A valid exculpatory clause precludes recovery by the victim of the

negligence.").

Where an exculpation clause is related to a duty of a party to obtain

insurance, public policy concerns are minimized; the existence of insurance means that an

injured party will not be left uncompensated.  See Reliance Nat'l Indemnity v. Knowles

Industrial Services, Corp., 868 A.2d 220, 226 (Sup. Jud. Ct. Me. 2005); Amica Mutual

Ins. Co v. Bergmeyer Assocs., Inc., 2008 WL 526032, at *4 (Mass. Super. Jan. 4, 2008);

see also Jalapenos , LLC v. GRC Gen. Contr., Inc., 939 A.2d 925, 933 (Pa. Super. 2007)

("[T]he insurance provisions . . . are not designed to unilaterally relieve one party from

the effects of its future negligence, thereby foreclosing another party's avenue of

recovery.  Instead, they work to ensure that injuries or damage incurred during the

construction project are covered by the appropriate types and limits of insurance, and that

the costs of that coverage are appropriately allocated among the parties.") (internal

citations omitted).

Similarly, contracts that effectively waive subrogation do not adversely

affect public policy.  See Penn Avenue Place Associates, L.P. v. Century Steel Erectors,

Inc., 798 A.2d 256, 259 (Pa. Super. 2002) (a waiver of subrogation are matters of contract

without public policy concerns).  Insurers can protect against waivers of subrogation by

setting higher premiums.  Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc., 916

A.2d at 695; Reliance Nat'l Indemnity v. Knowles Industrial Services, Corp., 868 A.2d at

227.

During the liability phase of the trial, I found Ginko responsible for the

reasonable costs of the pre-opening repairs and flood prevention.  Mr. Tota, as creditor,

27

bears the burden of proving the amount of his damage claim by a preponderance of the evidence. See Mahood v. Omaha Property and Casualty, 174 F. Supp. 2d 284 (E.D. Pa. 2001); see generally Bolus v. United Penn Bank, 525 A.2d 1215, 1225-26 (Pa. Super. 1987); Delahunty v. First Pennsylvania Bank, N.A., 318 Pa. Super. 90, 464 A.2d 1243, 1257 (1983); James Corp. v. North Allegheny School District, 938 A.2d 474, 495 (Pa. Cmwlth. 2007). By including his fixed expenses as part of his damage request, Mr. Tota implicitly requests compensatory damages, which "seek to put the injured person in a position as nearly as possible equivalent to his or her position prior to the tort[.]" Moorhead v. Crozer Chester Medical Center, 564 Pa. 156, 163-164, 765 A.2d 786, 790 (Pa. 2001) (abrogated on other grounds by Northbrook Life Ins. Co. v. Com., 949 A.2d 333 (Pa. 2008)) (citing Trotsky v. Civil Service Comm'n, City of Pittsburgh, 539 Pa. 356, 652 A.2d 813, 817 (1995). See also Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004) ("The goal is to restore the injured party, as nearly as possible, to the position the party would have been in had the wrongful conduct not occurred.").

        In general, the party seeking damages must prove the amount and cause of his loss under state law. Metz v. Quaker Highlands, Inc., 714 A.2d 447, 450 (Pa. Super. 1998). However, "mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct." Delahunty, 464 A.2d at 1257 (citing Pugh v. Holmes, 486 Pa. 272, 405 A.2d 897 (1979)). That is, "[d]amages are speculative if the uncertainty concerns the fact of damages not the amount." Carroll v. Philadelphia Housing Authority, 168 Pa. Cmwlth. at 281, 650 A.2d at 1100 (1994); see also Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d

28

at 58 ("The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged.").

Regarding the amount of the damages, "[Pennsylvania] law only requires that a reasonable quantity of information . . . be supplied by plaintiff so that the jury may fairly estimate the amount of damages from the evidence." Ashcroft v. C.G. Hussey & Co., 359 Pa. 129, 58 A.2d 170, 172 (1948). See Mahood v. Omaha Property and Casualty, 174 F. Supp. 2d 284 (rejecting some proffered damage values for failure to explain how amount was arrived at or what was covered, including: replacement of property not damaged by the flood, replacing damaged property with upgraded materials, and failing to apportion invoice to categories of work performed). The fact-finder determines damages after weighing the evidence and assessing the credibility of the witnesses. Delahunty, 464 A.2d at 1257. Some speculation necessarily accompanies the estimation of any damages. "Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof." Omicron Systems, Inc. v. Weiner, 860 A.2d 554, 565 (Pa. Super. 2004) (citation omitted). Indefiniteness as to damages does not absolutely preclude relief; "a claim for damages may be sustained if the amount may be fairly estimated from the evidence." Carroll v. Philadelphia Housing Authority, 650 A.2d at 1100.

Mr. Tota seeks both damages for injury to personal property/betterments, and for lost profits. Lost profits are generally recoverable in breach of contract and tort actions in Pennsylvania. See, e.g., Brisbin v. Superior Valve Co., 398 F.3d 279, 289 (3d Cir. 2005) (citing Delahunty v. First Pennsylvania Bank, N.A., 464 A.2d 1243).

> The general rule of law applicable for loss of profits in both
> contract and tort actions allows such damages where (1) there
> is evidence to establish them with reasonable certainty[;] (2)
> there is evidence to show that they were the proximate
> consequence of the wrong, and, in the contract actions; [(3)]
> that they were reasonably foreseeable.

Delahunty v. First Pennsylvania Bank, N.A., 464 A.2d at 1258 (citations omitted); see Bolus v. United Penn Bank, 525 A.2d at 1226 (permissible to use evidence of past profits in an established business; use evidence of experts if based on more than individual opinion or conjecture). "Lost profits are the 'net pecuniary gain from a transaction, the gross pecuniary gain diminished by the cost of obtaining them.'" Aiken Industries, Inc. v. Estate of Wilson, 477 Pa. 34, 43, 383 A.2d 808, 812 (1978) (quoting Restatement of Contracts, § 331, Comment (b)).

In meeting his burden of proof for lost profits, a claimant "is required only to provide the [fact finder] with a reasonable amount of information so as to enable the [fact finder] fairly to estimate damages without engaging in speculation. Damages need not be proved with mathematical certainty." Bolus v. United Penn Bank, 525 A.2d at 1226; see Brisbin v. Superior Valve Co., 398 F.3d at 289; Delahunty v. First Pennsylvania Bank, N.A., 464 A.2d at 1257; James Corp. v. North Allegheny School District, 938 A.2d at 494 (claim need only "be supported by a reasonable basis for the calculation.").

Despite its prescription against engaging in conjecture, the Pennsylvania Superior Court has explained that the estimation of lost profits, as with other damages,

30

necessarily involves some imprecision.  See Merion Spring Co. v. Muelles Hnos. Garcia

Torres, S.A., 462 A.2d 686, 698 (Pa. Super. 1983) (proof of lost profits not entirely of an

unspeculative nature); see also Waggoner Motors, Inc. v. Waverly Church of Christ, 159

S.W.3d at 57 ("[D]amages become too speculative only when the existence of damages is

uncertain, not when the precise amount is uncertain."); Thomasville Furniture Indus., Inc.

v. The Elder-Beerman Stores, Corp., 250 B.R. 609, 630 (S.D. Ohio 1998) ("Court is

mindful of the fact that proof of damages of lost profits often requires some conjecture.").

The Third Circuit Court of Appeals described the difficulty as follows:

> Undoubtedly, the District Court's damage calculation was to
> some extent imprecise.  But so were the calculations that
> Scully and US WATS advocated.  Importantly, we are
> satisfied that, in the circumstances presented, the District
> Court's damage calculation with respect to the stock option
> adequately puts Scully in a position most closely reflecting the
> one he would have occupied absent US WATS's breach.
> "[T]he law does not command mathematical preciseness from
> the evidence in finding damages."  Rochez [Bros., Inc. v.
> Rhoades], 527 F.2d [891] at 895 [3d Cir. 1975.  Instead, all
> that is required is that "sufficient facts . . . be introduced so
> that a court can arrive at an intelligent estimate without
> speculation or conjecture."  Id.; accord Indu Craft [v. Bank of
> Baroda], 47 F.3d [490] at 496 [2d Cir. 1995] (damages for
> breach of contract need only be proved with "reasonable
> certainty").
>
> In assessing damages, particularly for lost profits, we
> recognize the inevitability of some imprecision in the proof,
> and note that certainty as to the amount of damages is not
> required, particularly when it is the defendant's breach that
> has made such imprecision unavoidable.

Scully v. US WATS, Inc., 238 F.3d 497, 515 (3d Cir. 2001).

The Merion Spring court thus noted that damages will not be denied in their

entirety due to some uncertainty regarding the proof.  "'[A] defendant who has broken a

contract should not be allowed to profit by his breach because of the difficulty in fixing

damages with exactness. . . .'"  Merion Spring., 462 A.2d at 698 (quoting Smith v. Onyx

Oil and Chemical Co., 218 F.2d 104, 110, 111-12 (3d Cir. 1955)).  The court noted that

"'[i]t is not difficult to shoot these estimates full of holes as the (plaintiff) has done.  On

the other hand, . . . [w]e do not think this is a case where it can be really said that there

would have been no profit . . . had the contract been performed.'"  Merion Spring, 462

A.2d at 698 (quoting Smith v. Onyx Oil and Chemical Co., 218 F.2d at 110, 111-12);

see also Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d at 58

("desirable that an injured party not be deprived of compensation merely because it

cannot prove the extent of the harm suffered with complete certainty.").

        Of course, these principles must be balanced with the need for sufficient

evidence.  "Damages for lost profits, like other contract damages, may not be awarded

when the evidence leaves the trier of fact without any guideposts except his or her own

speculation.  Sufficient evidence must be introduced to permit a reasonably certain

estimate of the amount of anticipated profits lost due to the breach."  Merion Spring, at

686.

        In establishing the amount of lost profits, courts have relied on "evidence of

past profits in an established business," evidence of "[p]rofits made by others or by a

similar contract, where the facts were not greatly different," and evidence presented by

experts "if based on anything more than individual opinion or conjecture."  Bolus v.

United Penn Bank, 525 A.2d at 1226 (citations omitted).  Accordingly, "'[t]he kind and

amount of evidence that will be held to afford a sufficient basis for estimation varies

greatly in different kinds of cases.'"  Merion Spring, 462 A.2d at 696 (quoting

Restatement (Second) of Contracts, § 331 cmt. c); see, e.g., Bolus v. United Penn Bank,

525 A.2d 1215 (accepting expert's testimony on lost profits relying on actual record of

business, including ledgers, financial statements and tax returns, and trucking industry

profit data, and noting that the opposing party fully cross-examined expert on his

qualifications).

Moreover, an owner of a business may be competent to testify regarding the

amount of his damages. Bonjorno v. Kaiser Aluminum & Chemical Corp., 518 F. Supp.

102, 114 (E.D. Pa. 1981) (testimony of owner of damaged business may be sufficient to

support a verdict on damages where owner is qualified by experience and position to

make damages estimates). Oral testimony of damages rather than submission of

documents verifying the damages may be sufficient in appropriate circumstances. See

Maier v. Publicker Commercial Alcohol Co., 62 F. Supp. 161, 167 (D.C. Pa. 1945)

("Maier is competent to testify as to the wages paid so long as the facts are within his own

knowledge. It may be true that libelant's business entries might be entitled to greater

probative force than his oral testimony, but the business records are not preferred over

oral testimony nor is libellant required to produce them."). But see Trailer Ranch, Inc. v.

Levine, 523 So. 2d 629, 632 (Fla. Dist. Ct. App. 1988) (owner's testimony inadmissible

where he had day-to-day knowledge of operation of the business, but not overall concept

of value of the business; owner gave raw data to accountant who provided composite

picture).

Lastly, Ginko and Mr. Tota dispute Ginko's rolling assessment of fees on

late rent payments. Regarding the application of rent payments, longstanding

Pennsylvania law provides:

"The debtor has a right to make the application, in the first
instance, and failing to exercise it, the same right devolves on

33

the creditor.  When no application is made by either party, the
law determines how the payments are to be applied in
accordance with equitable rules and principles, and primarily,
it deems the payments to have been made in discharge of the
earliest liabilities of a running account–each item of credit is
applied in extinguishment of the earliest debit items in the
account; in other cases, it will apply the payment, when not
appropriated by either party, in the way most beneficial to the
creditor, that is, to the debt least secured, unless to the
prejudice of a surety.”

Toll-Barkan Co. v. Toll, 193 Pa. Super. 221, 225, 164 A.2d 36, 38 (Pa. 1960) (quoting

Page v. Wilson, 150 Pa. Super. 427, 433, 28 A.2d 706, 709 (1942)).


III.


A.


In his amended proof of claim, Mr. Tota divided his demand for

$225,601.15 into different categories.  First, he asserts that the debtor owes him

$29,542.76 for pre-opening repairs, itemized as follows:

- repairs and improvements made to meet Philadelphia health and safety
  code requirements consisting of:
  - making the restrooms handicap accessible ($3,300), and
  - applying sheet rock to exterior walls for fireproofing ($4,100)
- air conditioning and duct work and recharging ($7,245)
- heating unit upgrades ($2,368.85)
- fire alarm system installation ($3,920), and
- basement repairs to permit food storage ($8,608.91).

Ginko concedes to $3,300 for the restroom work, $4,100 for the

fireproofing, $7,245 for the air conditioning and duct work, and $3,920 for the fire alarm

system installation.  See Debtor’s Post-Trial Findings of Fact, ##1-3, 8.  As to the heating

34

unit upgrades, Ginko concedes only to $582.25, and as to the basement repairs, it concedes only to $1,400 of the repair costs.  Id., ##4-7, 9-20.


                                        1.


        At the liability phase of this contested matter I concluded that all of the improvements and repairs for which Mr. Tota demanded credit were either contractually due to the lessee or authorized by Ginko's agent, Mr. Garrett.  This liability however is limited to the reasonable cost of improvements and repairs.  Accordingly, in this damage phase of this claims dispute, Mr. Tota must demonstrate that the improvements and repairs were indeed made and that the costs for which he surcharges the debtor were reasonable and actually incurred.  Upon meeting this burden, that portion of his amended proof of claim shall be allowed, as Ginko has offered no independent evidence of its own on this aspect of the claim.

        First, Ginko promised Mr. Tota reimbursement by way of rent credits for replacement of two heaters in the basement.  See 1 N.T. at 50.  Mr. Tota testified that these heaters were replaced, requiring purchase of gas furnaces and necessary piping. 1 N.T. at 26.  He submitted into evidence a receipt from Riley Sales Inc., dated October 20, 2003, showing the purchase of two Gibson gas furnaces costing $509.37 and 472.50, and a "horizontal drai[n]" costing $22.33, for a total of $1,004.20. Ex. C-8.  The item numbers of the furnaces appear as GG6RC-040C12 and GG6RC-040C08.  Id.  An additional $60.25 on the invoice is not labeled, but equals 6% of the total, therefore it presumably represents the tax on the items, bringing this invoice's total to $1,064.45.  Id.

A cash register receipt for the $1,064.45 appears copied onto the second page of the exhibit (which is also an additional invoice).  Id.

A second invoice of Riley Sales, dated October 21, 2003, itemizes another gas furnace (item number GG6RC-060C12), costing $538.00, and several items of PVC piping, costing $14.12, for a total (including tax) of $585.25.  Id.  This invoice has "paid" handwritten on it.  Id.

A third invoice, dated October 21, 2003, itemizes one gas furnace (item number GG6RC-060C12).  Id.  A copy of an un-itemized credit card receipt shows $648.40 paid on October 21, 2003.  Id.  The credit card receipt is signed by Mr. Tota.  Id.

Finally, Mr. Tota submitted an invoice from Superior Plumbing Supply, Inc., dated December 5, 2003, in the amount of $656.00.  Ex. C-10.  He testified "I believe [this] was for the heating also[,]" 1 N.T. at 30, and asserted in his post-trial memorandum that these were "additional supplies" purchased by him.  Claimant's Post-Trial Memorandum, at 6, ¶ 29.

Mr. Tota testified that one heater cost "around four something, the other one was close to six hundred dollars.  Plus the parts.  You know, the PVC pipes and all that stuff."  1 N.T. at 72.  In his memorandum, he asserts that the furnaces and supplies from Riley Sales cost $1,712.85, which he paid for by cash in the amount of $1,064.45 and by credit card in the amount of $648.  Claimant's Post-Trial Memorandum, at 6, ¶ 27.

Ginko complains that the invoices of exhibit C-8 reference three heaters instead of the two claimed installed and that the October 20th invoice is not marked paid. In addition, Ginko maintains that the exhibit C-10 invoice was issued to Two Star Plumbing rather than to the debtor or to Delany Plumbing (which performed the labor).

36

Upon review, I agree that the invoices submitted itemize three different furnaces. The furnaces described on the second and third invoices match, but the second invoice sets the price at $538, while no price is listed with the third invoice. Moreover, the credit card receipt showing $648.40 does not correspond with the total on any of the invoices. While I found credible Mr. Tota's testimony regarding the replacement of two furnaces and the need for additional plumbing parts, and this is supported by a letter of Patrick J. Delany, the contractor who performed the labor, <u>see</u> ex. C-6, the invoices submitted are not sufficiently probative of all of the costs now asserted by Mr. Tota. Further, the invoice for $656, ex. C-10, is dated in December, well after the October work purportedly was completed. <u>See</u> 1 N.T. at 52 ("And then [Mr. Delany] came back late September or October to do the – to replace the heating and air conditioner.").

Contrary to Ginko's contention, however, there is evidence of payment of the first invoice, as copied onto the second invoice of the exhibit. Moreover, the debtor does not suggest that the amounts paid by Mr. Tota for the two lower-cost heaters were unreasonable.

Accordingly, based upon the evidentiary burden, I will allow $1,064.45 in damages representing the sum of the two lower-cost furnaces ($509.37 and $472.50), plus the horizontal drain ($22.33) listed on the first invoice, plus 6% tax.

2.

Mr. Tota also seeks $8,608.91 in reimbursement for basement repairs to permit food storage, for which he was promised rent credits, but Ginko concedes only to $3,100 of that repair cost.  Ginko Post-Trial Memorandum, at 3, ¶ 11.

Ginko objects that the repair quote from Mr. Tota's cousin, Besnik Tota, includes items beyond the clean-up and repair of the basement.  It agrees to $500 for clean-up and $1,200 for waterproofing only, arguing that the other work was "unauthorized."  Similarly, it suggests that the Home Depot receipts include charges for "unauthorized" supplies.

Mr. Tota testified that he paid Mr. Earl Thompson $1,400 for work on walls, steps, and clean-up and repair of part of the basement.  1 N.T. at 21-22.  Mr. Thompson was recommended to Mr. Tota by Mr. Garrett as someone who was working for Urban Shelter at that time.  1 N.T. at 21.  Ginko conceded to this part of the total claimed expense.

In support of the work performed by his cousin, Besnik, Mr. Tota submits a quote detailing what work Besnik would perform: $500 to clean up basement and take dirt outside; $1,200 to do waterproofing, and install a sump pump; $430 to pour concrete on the basement; and $2,500 to do carpentry work, framing, spackle, doors, and drop ceiling; for a total of $4,630.  See ex. C-7.  Mr. Tota submitted his business check stubs in support of having paid his cousin for this work.  See ex. C-23.  He testified that he paid his cousin with two checks, $1,400 and $1,500, and the rest in cash. 1 N.T. at 34.  Mr. Tota stated that the actual checks were cashed, but he does not have the cancelled checks. 1 N.T. at 67-69.  Mr. Tota also submitted 29 Home Depot receipts representing supplies

he purchased in connection with the basement work, totaling $2,578.91, which he paid in

cash.  See ex. C-24; 1 N.T. at 35.

Mr. Tota also swore that finishing the basement room was necessary to

meet Philadelphia health and safety codes concerning restaurants:

> And I also had to fix the basement.  The second part of the
> basement, because it was – I – it was very dirty and, you
> know, I could get all kinds of things in the – inside the
> restaurant from the basement. . . .  Because, first of all, the
> health department would never allow me to open the
> restaurant or to have a kitchen above that, you know that
> mess, you know, because it was mud and all kinds of stuff
> underneath. . . .  One of the guys that used to work for [the]
> City of Philadelphia, Leonard Persofsky.  He – while I was
> consulting with him, you know, this was one of the things that
> he told me to do. . . .  Because, otherwise, they were going to
> shut me down.

1 N.T. at 23–24

Though the evidence submitted in corroboration of Mr. Tota having paid his

cousin is limited, Ginko does not object on this ground.  As for whether the work was

included within the scope of the promised rent credit, in my July 2007 memorandum on

liability, I found that "Mr. Garrett promised a rent credit for the repairs to the basement of

the premises, which periodically flooded."  In re Ginko, 372 B.R. at 235.  I thus disagree

with Ginko that this work was not necessary.  Therefore I will accept that Mr. Tota did

indeed pay his cousin for basement repairs and allow the full $4,100 of Besnik's invoice

as reasonably necessary.

Conversely, I note that the Home Depot receipts include items not

representing supplies but constituting tools, such as jig and reciprocal saw blades, a

masonry brush and a utility brush, and a propane cylinder, all more typically used as

reusable tools by the person making the repairs, as well as a door lock kit, trash bags,

light bulbs, and tape, not within the scope of waterproofing the basement.  More

importantly, as Mr. Tota did not segregate by job the items on these 29 receipts purchased

(e.g., cementing versus installing drop ceiling), he has not met his evidentiary burden on

this point.  Therefore, I shall sustain Ginko's objection and disallow the entire $2,578.91

requested as insufficiently proven as reasonable, necessary and authorized by Ginko's

agent.  See Mahood v. Omaha Property and Casualty, 174 F. Supp. 2d 284 (rejecting

proffered damage values, inter alia for failure to apportion invoice to categories of work

performed).

 Therefore I will allow $6,030 on this portion of Mr. Tota's amended claim.

 The total amended claim allowed as reimbursement for pre-opening

restaurant repairs therefore is $25,659.45.


B.


1.


 The next component of Mr. Tota's claim involves damages to his personal

property as well as lost profits caused by the burst water pipe in January 2005.  Mr. Tota

estimated that preliminary repairs to the leasehold took 35 days, during which the

restaurant was partially closed.  He contends he will need to close the restaurant again, for

two months, to make permanent repairs.

 Before I consider whether damages for these elements have been proven, I

note that the parties dispute whether the lease agreements as a whole place the liability for

40

these damages on the lessor, or whether the lessee is limited to recovery only from his

own insurer.  This portion of the claim is most significant, as Mr. Tota asserts damages in

the total amount of $189,058.39.  While Mr. Tota avers that the payment from Regis did

not reimburse him in full for the repairs and lost profits already incurred, as well as the

repairs and lost profits to be incurred by him, he does not argue that Regis should pay him

more,[13] but instead looks solely to Ginko as the tortfeasor.

Mr. Tota focuses on the provision of the Lease, section 11 (quoted earlier)

as placing liability upon the lessor for its own negligence.  Claimant's Reply to Debtor's

Post-Trial Findings of Fact and Law, at 10.  He also argues that Ginko's failure to make

repairs as provided under section 12 of the Lease (also quoted above) renders it liable for

all damages, including lost profits and business interruption.  Id.  Finally, Mr. Tota

maintains that because his insurance policy did not name Ginko as a loss payee, and

because Ginko failed to obtain insurance on its own, the lessor cannot now be considered

a co-insured and subrogation should not be barred.  Id., at 10-11.

Ginko responds by emphasizing the Lease Addendum's insurance

provision, section 10, wherein the lessee purportedly releases the lessor "for any damage

or loss to any personal property, equipment, fixtures and/or leasehold improvements of

Lessee or any other person upon the demised premises."  It argues that this provision

exculpates the lessor from liability for damage to the contents and leasehold

improvements.  Ginko's Post-Trial Memorandum of Law, unpaginated, at III.A.

---

[13]As quoted above, Mr. Pagano sent to Regis on Mr. Tota's behalf a letter
containing the statement that "we arrived at a gentleman's agreement to settle in full the
betterments and improvements business personal property for $32,500 pending a proof of loss."
Ex. I-4 (emphasis in original).  Whether this constituted a release between Mr. Tota and Regis is
an issue between these parties only; i.e., it does not affect Mr. Tota's claim against Ginko.

The requirement for the lessee to obtain insurance and to list Ginko as a co-insured demonstrates an intent to shift the burden of loss of personal property to the claimant's insurance carrier, Ginko contends.  Id.  Moreover, Ginko dismisses the provisions of section 11 of the Lease as having been modified by the preface in the Lease Addendum purporting to override anything in the Lease Agreement to the contrary.  Id. And, Ginko continues, because Mr. Tota has no recourse to Ginko for damages, neither does Regis.  Id.

I note that, at the liability hearing, Ginko conceded that the insurance provision of the lease addendum did not address lost profits.  In re Ginko Associates, L.P., 372 B.R. 229, 243 (Bankr. E.D. Pa. 2007) ("As debtor's counsel conceded at the trial, damages due to the interruption of business operations were not addressed in section 10 of the addendum.").  However, Ginko strongly disputes the amount of damages for lost profits demanded  by Mr. Tota.

Finally, Regis maintains that its insurance policy with Mr. Tota provided for a right of subrogation.  It argues that section 10 of the Lease Addendum, to the extent it implicitly precludes subrogation, is unenforceable because it conflicts with section 11 of the Lease Agreement, as it appears to eliminate the liability for negligence created by section 11.  Regis further contends that the Lease Addendum fails to clearly express an intention of the parties to absolve Ginko from liability for damage to personal property and leasehold improvements caused by water leakage caused by its own negligence. Regis also argues that section 10 of the Lease Addendum is void as against public policy because it attempts to transfer liability for negligence away from Ginko, the tortfeasor.

42

2.

To resolve this issue, I begin with paragraph 11(a) of the Lease. Standing

alone, courts have upheld the validity of this provision, either as originally worded or as

modified. See Frankel v. Arch Street Corp., 35 Pa. D. & C.2d 453 (Ct. Common Pleas,

Phila. Cty, 1964) (unmodified); Kotwasinski v. Rasner, 436 Pa. 32 (1969) (modified).

Indeed, in Kotwasinski, where an identical clause was identically altered by striking the

word "whether" and replacing it with the word "unless," Pennsylvania's Supreme Court

interpreted the modification as one "in which the lessors are obviously made liable for

damages resulting from their negligence." Id., at 37. See Princeton Sportswear Corp. v.

H&M Associates, 510 Pa. 189, 507 A.2d 339, 341 (1986) (where typewritten addendum

to exculpatory clause excepted the negligence of the lessor from the terms of paragraph

11, and lessor was found negligent, court held lessor liable for damages).

Because of the alteration made by the parties in this instance, this clause

functions as an inculpatory clause, holding the lessor liable for damages caused by any

fire, breakage or leakage, or from leakage of water, rain or snow, or (per § 11(b)) due to

the use, misuse or abuse of all or any of the elevators, hatches, openings, stairways,

hallways, of any kind whatsoever, if caused by the lessor's negligence. Importantly here,

section 11 of the lease would hold Ginko liable for damages due to water leakage caused

by its negligence.

But in light of Pennsylvania's contract interpretation principles, this

provision must be harmonized, if possible, with the provisions in the Lease Addendum.

Section 10 of the Lease Addendum requires the lessee to obtain Comprehensive General

43

Public Liability Insurance, including contractual and fire legal liability insurance, and

dram shop insurance, if applicable.  In addition, section 10 provides (twice) that the lessor

be named as an additional insured.

Although the second paragraph of this section 10 begins with a requirement

that the lessee provide proof of "said insurance" and its continued coverage, the provision

then shifts from insurance requirements covering third party injuries to addressing

damages to personal property.  In the sentence whose meaning is debated by the parties,

the Lease Addendum states that the "Lessee acknowledges and agrees that Lessor shall

not be responsible or liable in any way to Lessee or any other person, for any damage or

loss to any personal property, equipment, fixtures and/or leasehold improvements of

Lessee or any other person upon the demised premises."  Ex. C-2, at § 10.  It then

requires the lessee to obtain "a policy of fire and hazard insurance covering all of lessee's

contents and leasehold improvements at the demised premises at the replacement value

thereof."  Id.  Notably, as acknowledged by Ginko at trial, damages for business

interruption are not addressed.  Compare Philadelphia Plaza-Phase II v. Bank of

AmericaNat'l Trust and Savings Bank Assoc., 2002 WL 1472337, at *1 (Pa. Com. Pl.

June 21, 2002) (loan agreement required that borrower maintain "(a) Special form

property damage insurance on the Property, with a policy limit in an amount not less than

the full insurable value. . . .  The policy shall include business interruption (or rent loss, if

more appropriate) endorsement in the amount of twelve months' projected income from

the Property. . . .  (b) Commercial General Liability coverage[.]").

The final paragraph of section 10 of the Lease Addendum provides that if

the lessee fails to obtain "such insurance policy or coverages required hereunder," then

the lessor may either obtain the insurance on its own but require the lessee to reimburse it, or may terminate the lease upon notice.

Finally, an indemnification provision of the Lease Addendum places liability on the lessee to the extent that injuries arise "out of or flowing from the operation of Lessee's business and/or the use and occupancy of the demised premises, and/or from any bodily injury or property damage or loss sustained by Lessee or any of Lessee's employees, agents, patrons or invitees upon the premises, and/or from a breach of the Lease by Lessee." Ex. C-2, at § 14.

Comprehensive General Public Liability Insurance, now known as Commercial General Liability Insurance,[14] "is designed and intended to provide coverage to an insured for tort liability for physical injury to the person or property of others." 9A Couch on Insurance, eds. Russ and Segalia (3d ed. 2007), at § 129:4. Generally it "is not intended to provide coverage for the insured's contractual liability which merely causes economic losses." Id. Here, however, the insurance provision additionally required

---

[14]The name was changed in 1986. 9A Couch on Insurance, eds. Russ and Segalia (3d ed. 2007), at § 129:1. A treatise on insurance warns:

> The parties should take care when referring in their contract's insurance requirement provision to a specific insurance policy form or endorsement by name or number. This level of detail may not be required, and meeting it may be difficult, if not impossible. A particular insurance form may be replaced or outdated during the effective dates of the contract. Worse, it may no longer be available if the contract language itself is outdated. By way of illustration, demanding maintenance of a *comprehensive* general liability policy may create complications as that product now is known as *commercial* general liability policy.

1-1 New Appleman Insurance Law Practice Guide (Matthew Bender, 2008), at 1.03[3][a] (emphasis in original).

contractual and fire legal liability insurance coverage.  Contractual liability insurance

pays damages "by reason of the assumption of liability in a contract or agreement."  Id., at

§ 129:31.

       Coupled with the requirement that the lessor be coinsured, this contractual

provision evidences an intent by both the lessee and lessor that all damages to third

parties be covered by insurance, at least to the minimum of $1 million coverage.  If

damages exceed the $1 million policy limit, the lessor and lessee could hold the other

party liable, as appropriate.  For example, the lessor's liability beyond $1 million would

be limited by the indemnification provision of the Lease Addendum to the extent that

injuries arose out of the operation of the lessee's business.

       The middle paragraph of the insurance provision holds the lessee

responsible for damage to any personal property and additionally to protect his personal

property through the purchase of insurance.  This paragraph can be interpreted consistent

with the first paragraph of section 10, in that damage to third party personal property

would be covered by the Commercial General Public Liability Insurance, and additionally

by the contractual and fire insurance, while damage to the lessee's personal property

would be covered by his own fire and hazard insurance.  Because that latter insurance is

at replacement value rather than requiring a dollar amount cap, it appears that the

intention of the parties was that all of debtor's personal property be covered by this

replacement policy.

       In interpreting this second paragraph of Lease Addendum section 10, I note

that the exculpatory clause contained within this Lease Addendum section holding the

lessee liable for its own personal property damage is valid under Pennsylvania law: it

does not contravene public policy, as it simply shifts recovery for personal property damage to Mr. Tota's insurer; the Lease and Lease Addendum were entered into by persons relating entirely to their own private affairs, a landlord/tenant agreement; and as Ginko and Mr. Hima were represented by counsel, and Mr. Tota was merely added to the lease, the parties were free bargaining agents and the contract was not one of adhesion. Further the section appears enforceable under Pennsylvania law, see Topp Copy Products, Inc. v. Singletary, 533 Pa. at 471, as clearly releasing the lessor from liability for damage or loss to personal property of the lessee.

      While I agree that the insurance provisions of the Lease Addendum were intended to exculpate Ginko and thus override Lease section 11, the override is only partial. Lease Addendum section 10 was not intended to eliminate the negligence provision of Lease section 11 in its entirety.

      In construing the contract as a whole, including the Addendum's preface, I conclude that the intent of the parties was for the lessee to be responsible—through purchase of insurance—for damages to his own personal property, even damages caused by the lessor's negligence, while the lessor would be responsible for damage to third party property beyond the $1 million level if due to fire or flood, etc., and due to the lessor's negligence. The preface's language instructing that the Addendum's provisions prevail over Lease provisions to the contrary support this interpretation.

      I also conclude, however, that Lease Addendum section 10 was intended only to relieve Ginko for liability for Mr. Tota's personal property damage, and not for his lost profits damage. There was no requirement in section 10 for the lessee to purchase business interruption insurance and to look solely to that policy for any recovery.

47

In coming to this conclusion, I observe that the Lease was altered not once but twice to shift liability to the lessor, see ex. C-1, § 11(a) and (b) (regarding use, misuse or abuse of the elevators, hatches, openings, stairways, or hallways), supporting that the transfer of liability to the lessor was intentional.  Contract interpretation canons instruct that alterations to contracts—typed or handwritten changes or additions—should be given more weight than preprinted clauses.  Musko v. Musko, 548 Pa. 378, 381, 697 A.2d 255, 256 (1997) (citing Western Oil Fields, Inc. v. Pennzoil United, Inc., 421 F.2d 387, 389 (5th Cir. 1970) ("Further, the typewritten insertion like the asterisk clause should prevail over the printed matter.")).

I appreciate that the Lease Addendum is not necessarily a preprinted form as it was drafted by Ginko specifically to apply to this lessee.  See, e.g., section 9 specifying work to be done by Ginko at the premises.  Where two portions of an altered contract squarely conflicted—one alteration was contained in an addendum to the contract and the other consisted of a preprinted form with blanks filled in—the Pennsylvania Superior Court held that the addendum as altered controlled, as its changes constituted more than merely filling in blanks and therefore more greatly reflected the intent of the parties.  Cusamano v. DiLucia, 421 A.2d at 1124 (1980).

But here I cannot conclude that the Lease Addendum's provisions in section 10 squarely conflict with lease section 11.[15]  One can harmonize them by recognizing the

---

[15]Some of the other alterations to the Lease Agreement, such as deleting the provisions regarding payment of taxes and water and sewer rent, make sense within the agreement as a whole as the Lease Addendum then addresses these issues without conflicting with the Lease Agreement.  But the Preface would need to be applied to reconcile the Lease provision that increases in fire insurance premiums would be charged to the lessee as additional rent with the Addendum's requirement that the lessee obtain the fire insurance itself and pay for

(continued...)

48

limited scope of section 10 of the Addendum.  Furthermore, any ambiguities on this point should be construed against Ginko, as the drafter of these documents.  Rusiski v. Pribonic, 511 Pa. at 390; Fleetway Leasing Co. v. Wright, 697 A.2d at 1003; In re Andrews, 78 B.R. at 81.

In summary, Lease section 11 maintains liability on the lessee injury to the lessee or third parties, "caused by any fire, breakage or leakage . . . or from water, rain or snow that may leak into, issue or flow from any part of the said premises . . . or from the drains, pipes, or plumbing work of the same . . ." unless caused by the negligence of the lessor.  Read with the Lease Addendum's insurance provision results in a finding that injuries to the lessee's personal property would be the responsibility of the lessee through required insurance covering the replacement value of the property.  As this does not include other types of injuries (such as loss of business), the lessor is responsible if other injuries are caused by fire or flood, etc., and due to its negligence.[16]

Accordingly, I find that Mr. Tota, when he adopted the lease provisions negotiated by his cousin, agreed to look solely to his insurance carrier, Regis, for recovery of damages to his personal property; however, Ginko is liable for the consequential

---

[15](...continued)
all renewals of the policy.

[16]If Ginko intended otherwise, it should have made the exculpation of its liability for negligence explicit.  See, e.g., Church Mutual Ins. Co. v. Palmer Const. Co., Inc., 153 Fed. Appx. at 807 ("The Owner and Contractor waive all rights against each other . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 17 or any other property insurance applicable to the Work."); Penn Avenue Place Associates, L.P. v. Century Steel Erectors, Inc., 798 A.2d at 260 (same; plus the clause required that the insurance policies provide waivers of subrogation).  Not having done so, it remains liable for damages due to business interruption.  See Cannon v. Bresch, 307 Pa. at 36.

49

damages of business interruption/lost profits.[17]  In addition, applying principles of

subrogation, I find that Regis is limited to the same rights as Mr. Tota and therefore may

pursue reimbursement to the extent it paid for lost profits but not for damage to Mr.

Tota's personalty.[18]

3.

Mr. Tota claims $117,320.08 total for lost profits.  Relying primarily upon

business tax return forms, the claimant computes the February 2005 business loss by

adding the net monthly profit to the operating expenses for that month, for a total loss of

$22,820.08.  He calculates the business loss for an estimated future two month closing by

taking the average gross monthly receipts for 2007, less 25% for the cost of goods sold, to

obtain a gross monthly profit.  He then reduces the average monthly operating expenses

by those costs that would not occur during a closing and subtracts that number from the

gross monthly profit, leaving a net monthly profit, which he doubles for the estimated two

month closing, for a total of $94,500.00.

---

[17]Mr. Tota had argued that the debtor's failure to make repairs as provided under
section 12 of the lease rendered it liable, but as the provision for lessor repairs is permissive, the
lessor's failure could not serve as a basis for holding it liable.

In addition, Mr. Tota argued that because the insurance policy did not in fact name
Ginko as a loss payee, and Ginko failed to obtain insurance on its own, it cannot now be
considered a co-insured and subrogation should not be barred.  Again, the Lease Addendum
provision regarding the lessor obtaining insurance was permissive.  The requirement that the
lessee name the lessor as a co-insured, however, was not, but arguably applied only to the
requirement to cover losses to third parties and thus the argument is inapposite here.

[18]Indeed, the subrogation clause of the SMP Amendatory Endorsement, ¶
1(6)(c)(2), seems to permit the insurer to waive subrogation rights as to personal property
damages if such waiver is made prior to the occurrence of any loss.

Ginko counters that the total net taxable income on Mr. Tota's 2005 tax return was only $85; thus the debtor extrapolates that the net income loss for the 35 day closure should total "less than $8 (1/12 of $85)." Debtor's Post Trial Memorandum, at I(C), at ¶¶ 5-6, 9. Ginko also challenges many of Mr. Tota's expenses during the 2005 closure and the anticipated future closure, and the evidence or lack thereof supporting them, the estimates of 2007 income and expenses, and the two month anticipated closure time. The debtor does not suggest a different total for lost profits for the anticipated second closure; instead it maintains that Mr. Tota has not met his burden to establish damages for lost profits with sufficient specificity.

a.

I begin with the profits lost on account of the 2005 closure. That there was a need to close the restaurant to make repairs is not debated by the parties. As discussed above, however, there is an uncertainty regarding how many days the restaurant was fully versus partially closed. Having not provided evidence supporting full closure for the entire 35 days, with the burden on Mr. Tota to so show, I find that the restaurant was able to operate at an average of 30% of normal capacity. And again, with no evidence to the contrary, I find that the restaurant's lost profits during that closure were 70% of the usual

51

profit.[19]  And because of the uncertainty regarding the number of days fully versus

partially closed, I will prorate the damages on a monthly rather than a daily basis.

Preliminarily, I reject Ginko's calculation of lost profits by dividing by 12

the 2005 taxable income, because the taxable income includes a deduction for a net

operating loss carryover.

I also reject Mr. Tota's total reliance on figures from 2005 however.  The

restaurant closure took place during the first two months of 2005.  It is clear from the tax

returns that the restaurant increased its profits over time.  Therefore to use only post-

closure income and expenses inflates the profit.  Because there is no quarterly breakdown

of profits however, I will make an estimation by averaging the 2004 and 2005 figures.

See Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d at 59 (best

evidence of lost profits is comparison of business before and after the tort).  In doing so, I

acknowledge that the restaurant had only been open for three months at the start of 2004.

However, that is balanced by averaging that year's income and expenses, and also by

incorporating figures from all of 2005 despite the closure occurring at the beginning of

that year.

---

[19]That is, if a restaurant has 100 tables and normally fills all tables, then a loss of
20 tables could support a loss of 20% of the restaurant's profits.  But if the restaurant regularly
filled only 80 of the 100 tables, then a loss of 20 tables might not affect profits.  Here, there was
no competent evidence supporting Mr. Tota's "before and after" business.
        However, Mr. Tota testified that the average cost of a meal ($30) has remained
constant.  2 N.T. at 109-110.  Therefore he must have been filling more tables over the years for
the gross income to have increased from 2004 to 2005 and then to 2007.  In addition, he testified
that in 2005, he did 450-550 "covers" per week, and in 2007 he averaged 550-650.  2 N.T. at
109-110.  That equals a 16-19 percent increase over the two years.

In 2004, the restaurant took in $402,582 in receipts, less $166,767 in cost of goods, less $230,375 in expenses, leaving a net profit of $5,440. This averages out to a monthly net profit of $453 for 2004.

The 2005 calculation is almost as simple, though not as simple as Mr. Tota made it: I reject his dividing the income by 11 months but the expenses by 12, considering that the restaurant was partially open in January/February 2005. He thus still earned 30% of his average monthly income during that time, and while some expenses were incurred in full regardless of the partial closure, others were incurred at an estimated 30% of the normal amount.

In 2005, the restaurant took in $493,216 in receipts, less $210,324 in cost of goods. To calculate an average monthly profit, I divide the gross profit—493,216 minus $210,324 equaling $282,892—by the 11.3 months the restaurant conducted business. Dividing $282,892 by 11.3 leaves an average monthly gross profit of $25,035.

The 2005 expenses as reported on the tax return totaled $269,129, divided by 11.3 for an average monthly expense of $23,817. Subtracting this from the average monthly gross profit yields $1,218 as the 2005 average monthly net profit. Averaging this net profit with that of 2004, results in a $836 blended profit. This then is the estimated lost profit for the 2005 closure.

Mr. Tota is also entitled to damages equaling the fixed expenses he incurred during the 2005 closure. In other words, to the extent that he incurred certain expenses during the 2005 closure, which expenses being fixed were payable whether or not the restaurant was operational—e.g., rent, insurance—he should be reimbursed by the debtor

for those expenses to restore him to the financial position he would have been in had the closure not occurred.  (Otherwise, those fixed expenses would be "paid" twice.)

Since the total of the 2004 and 2005 expenses do not vary much, and many expenses likely were established on an annual basis—e.g., taxes and licenses, trash removal, insurance—I will use the 2005 expenses only in estimating Mr. Tota's fixed expenses during the 2005 closure.

I start with the average monthly expenses in 2005 of $23,817.  Mr. Tota testified that he did not have to pay laundry, customer parking, travel, interest, or office expenses during the closure.  In addition, he stated that he would not pay as much for heat and light or for credit card charges.  He asserted that the expenses not incurred saved him $2,866 during the partial closure, but I find a different amount.

That Mr. Tota did not travel during the closure is understandable and thus credible.  However, if the restaurant were operating at 30%, then he would have had some laundry, customer parking, and possibly some office expense.  Thus I will only subtract out 70% of the monthly average of these three expenses rather than the full amount as Mr. Tota urged.  He also would have had some heating and lighting expense, both due to the partial operation and the need for heat and light while repairs were being made.  Thus I will exclude 50% of this average monthly cost.  Regarding the credit card expense, Mr. Tota testified that he would not have "all those fees" if he were closed.  2 N.T. at 133.[20]

---

[20]On direct testimony, the following exchange took place:

Q. How about your credit card fees?
A. I pay up to, between 15 and $1,800 a month.
Q. But again, they wouldn't be, you wouldn't have those fees, all those fees –
A. Not –

(continued...)

Since he did not specify how much the fees would be reduced (e.g., a percentage of sales versus a fixed monthly fee) I will reduce the fixed expenses by the full average monthly amount.  Finally, it is not clear why the interest expense, described as interest on debt obligations, 2 N.T. at 135-36,[21] would be stayed during a closure.  Thus this expense will not be removed.

On the other hand, Mr. Tota's professional fee expense, described as attorney fees, see 2 N.T. at 116, is not a fixed cost incurred regardless of whether the restaurant is running, thus I will subtract out the average monthly amount of that expense

In sum, I find that during the 2005 closure the fixed expenses for which the claimant could generate no revenue equaled $18,296, computed as follows:

| | | |
|---|---|---|
| Average monthly expenses | $23,817 | ($269,129/11.3) |
| minus travel | 4 | ($41/11.3) |
| minus laundry | 875 | (70% of $9,893/11.3) |
| minus parking | 591 | (70% of $6,678/11.3) |
| minus office supplies | 729 | (70% of $8,241/11.3) |
| minus heating/lighting | 1,946 | (50% of $21,986/11.3) |
| minus professional fees | 2,677 | ($30,425/11.3) |
| minus credit card fees | 331 | ($3,738/11.3) |
| | | |
| TOTAL | $18,296 | |

Adding $18,296 in expenses to the $836 lost profit results in $19,132 in damages for the 2005 closure.  This allowance reimburses the claimant for injury caused by the debtor to Branzino restaurant operations in 2005.

---

[20](...continued)
Q. – if you were closed?
A. Correct.

2 N.T. at 133.

[21]"Q. How much do you pay in interest, if you know?  A. Interest?  Q. Interest. That's you're paying money for money borrowed."

b.

For the lost profit damages to be incurred in a future closing, Mr. Tota relies on his testimony estimating income and expenses existing in 2007, and bases the total on a two month closure.  Ginko complains about the validity of these estimates, given without supporting documentation, and challenges the two month time frame. Ginko did not offer an alternative amount of damages, nor at trial did it cross examine Mr. Tota on any of his 2007 estimates.

Upon my review of the testimony and documentary evidence I conclude that Mr. Tota has shown by a preponderance of the evidence of the need for additional repairs. Mr. Ozeroff's testimony and report estimate in particular support the need to fully repair and restore the ceilings, walls and floors damaged by water.

As for the length of the closing, I find that only seven weeks has been proven.  No explanation was given for Mr. Ozeroff's rounding up to two months his admitted initial estimate of seven weeks.  I also find sufficient evidence that the restaurant must be fully closed during that period, as the necessary repairs are that extensive and intrusive.

Finally, as described above, Mr. Tota's testimony regarding 2007 income and expenses was not the picture of accuracy.  However, I am mindful that in meeting his burden, Mr. Tota is required only to provide the factfinder with a reasonable amount of information so as to enable reasonable estimation of damages without engaging in speculation, while Ginko should not obtain a windfall by dint of the less-than-perfect

56

evidence.  Expert testimony as to lost profits, while often helpful, is not required.  See

Jahanshahi v. Centura Development Co., Inc., 816 A.2d 1179, 1184 (Pa. Super. 2003).

I accept, therefore, Mr. Tota's estimation of average monthly gross receipts

in the first half of 2007 as $65,000.  This is the kind of information a business owner

would know and is consistent with increases in income from 2004 to 2005.

I do not accept, however, Mr. Tota's 25% estimate of the cost of goods,

considering its variance from the 42-43 percent in 2004 and 2005.  While his profit

margin could have increased, Mr. Tota presented no evidence—such as the restaurant's

2006 income tax return—to support such a finding.  In addition, he testified that his cost

of goods in 2007 was the same as in 2005.  2 N.T. at 126.  Therefore, I will apply a 42

percent cost of goods (the 2005 number) to the gross receipts, resulting in an annual gross

profit of $452,400.  Seven weeks of this gross profit equals $60,900 ($452,400 divided by

52 times 7).

I next look to the estimated average expenses.  Several estimates vary

greatly from those reported on the restaurant's prior year tax returns.  For example, the

taxes and licenses annual expense in 2004 was $8,926 and in 2005 was $24,716, whereas

Mr. Tota estimated only $1,200 in 2007.  Equipment rental cost him $3,602 and $324 in

2004 and 2005, respectively, but Mr. Tota estimated from $12,000 to $18,000 in 2007.

Credit card fees were only $3,738 in 2005, but estimated at $12,000 in 2007.  Though Mr.

Tota did not offer any testimony detailing the differences beyond expenses having

increased since 2005, he did testify using the 2005 figures as a guide, see 2 N.T. at 130,

so that he was aware of the prior figures.

Accordingly, I will accept the estimates of 2007 expenses as testified to by Mr. Tota. In so doing, I note that the amount for some categories of expenses—depreciation, office supplies, and payroll services—were unknown to him, and that he testified that he had no interest, outside services, or travel expenses in 2007. See 2 N.T. at 136 (regarding no interest). In addition, to the extent the expense testimony was inexact, I will use the higher end of Mr. Tota's estimates in computing lost profits (and the lower end in computing fixed expenses) as this is somewhat beneficial to Ginko. Based upon my review of the evidence, I find that Mr. Tota's 2007 estimated annual expenses were $434,920. Seven weeks equals $58,547 in expenses ($434,920 divided by 52 times 7). Therefore, his anticipated net profit for a seven week period would be $2,353 ($60,900 minus $58,547).

As for fixed expenses—those that Mr. Tota must pay even though his restaurant will not be operational—Mr. Tota again avers that during a closure he would not incur expenses for laundry, parking, travel, interest, office expenses, heat and light, or credit card fees, but this time resulting (in his view) in a decrease in fixed expenses of $1,500 per month, as he ended up only including laundry and parking in his calculation.

I find that the actual annual cost of these expenses equals about $72,000.[22] Since Mr. Tota will still need to heat and/or air condition the premises during the work, and light it, I will use only half of their $30,000 annual cost, resulting in $57,000

_____

[22]The annual amounts (on the lower end of the estimates) are: laundry, $12,000; store supplies, $6,000; parking, $6,000; credit card fees, $18,000; and heat and lighting, $30,000. Mr. Tota reported no travel or interest expenses in 2007.

annually, with seven weeks equaling $7,673.[23]  Subtracting that from the $58,547 average

leaves $50,874 in expenses that would still be incurred by Mr. Tota even though his

restaurant will be not operational and undergoing repairs and renovations.

Therefore, the total damages estimated to be incurred by Mr. Tota during a

needed seven week closure totals $53,227 ($50,874 in fixed costs plus $2,353 in lost

profits).


C.


1.


Finally, Mr. Tota seeks return of a $7,000 security deposit required in the

Lease Addendum and purportedly tendered by his cousin, Mr. Hima, at the

commencement of the lease.  As co-lessee Mr. Tota has standing to seek such relief.

Mr. Tota argues that there is no evidence that Ginko transferred this deposit

to the new owner of the realty upon its sale.  He recognizes that section 15 of the Lease

Addendum affords the option to the lessor to transfer that deposit upon sale of the realty,

see ex. C-2, but argues that because Ginko provided no proof of transfer of the deposit,

the debtor remains liable to Mr. Tota for that amount.  The claimant also maintains that

the security deposit was paid in full, as Ginko never asked him to pay any portion of the

---

[23]I again subtract out the full credit card expense since Mr. Tota did not explain
what makes up the charge.

security deposit, and as Ginko's attorney did not include in his December 2005 letter any demand for either the full security deposit or the $500 that Ginko now alleges is still due.

As just mentioned, Ginko argues that $500 of the security deposit was never paid as its ledger shows only $6,500 paid on account of the security deposit.  See exs. D-1 and D-2.  It does not contend that the security deposit was paid over to the realty purchaser.

The lease (as quoted earlier) allows Ginko to apply the security deposit to any default of Mr. Tota, such as for unpaid rent and other charges that the debtor alleges are owing in its counterclaim.  Furthermore, the lease leaves as permissive ("may") whether Ginko had the right to transfer the security deposit to the new owner of the premises.  Barring that transfer or setoff for outstanding lease obligations, Ginko remains liable to its tenant for the security deposit.  (If Ginko did not transfer the deposit to the new owner then Mr. Tota may be liable to his present lessor, but that issue is not before me.)

Rather than claim that its liability was discharged by transferring the security deposit to the new owner, Ginko seems to concede that the claimant has a $6,500 credit, but seeks to offset this deposit as part of its back rent counterclaim.  See Ginko Objection to Claim, ¶ 8 ("Therefore, the Claimant's breach under the Lease [unpaid rent] eliminates its right to seek a refund of the security deposit.").  Thus, it seems agreed that Ginko remains liable for the security deposit to Mr. Tota, potentially offset by any back rent owed by Mr. Tota.

Insofar as the parties dispute the amount of the security deposit previously paid to Ginko, I find that Ginko likely received $7,000 as a deposit.  As the claimant

60

notes, the lessor never previously demanded an additional $500 from the lessee, either

when Mr. Tota was added to the lease in May 2003—despite knowing that Mr. Hima had

been deported— nor requested through Ginko's attorney in December 2005, when

counsel demanded prompt payment by the lessee of his outstanding obligations.  Ex. C-

14.  Moreover, Ginko's ledger accounts showing $3,500 paid on the deposit on November

16, 2001 (with an additional $3,000 paid on January 7, 2002) are not authoritative, given

that it did not sign any lease with Mr. Hima until January 9, 2002.

Therefore, I find that it is more likely that the extra $500 had been paid

prior to the execution of the Lease Modification with Mr. Tota in 2003, but inadvertently

not credited to the lessee.  Accordingly, Mr. Tota is entitled to a return of the $7,000

tenant security deposit, less any sums due Ginko for unpaid rent and other charges.

2.

Ginko asserts a counterclaim as an offset to any sums due Mr. Tota.  In that

regard, it contends that $14,680.05 is owing, consisting of unpaid rent, late charges,

various taxes, and water and sewer charges.  See ex. D-1.

Mr. Tota debates the legitimacy of the late charges and the apportionment

of some of the taxes, and argues that Ginko's ledger reflects a double billing for unpaid

2005 real estate taxes.  He admits, however, that he owed the lessor certain charges in

December 2005, as itemized in attorney Hing's December 2005 demand letter; he denies

though, owing all of the other charges appearing on Ginko's ledger prior to that

December 2005 date.  Finally, Mr. Tota asserts that Ginko has no standing to assert these unpaid rent and other charges, as it is no longer owner of the building.

Since Ginko was the owner of the building at the time of the alleged omitted payments, and as there is no evidence that the new lessor was assigned Ginko's claim and is demanding payment, I conclude that Ginko is the proper party to assert this counterclaim.  In addition, the Lease Agreement provides that Ginko may retain the security deposit or any part thereof if the lessee has not complied with all of the terms of the lease.  Ex. C-1, § 27.  Therefore, Ginko can offset Mr. Tota's claim for the return of the security deposit against rents and other charges owed under the lease.

As detailed previously, on December 19, 2005 Ginko's attorney sent Mr. Tota a letter demanding payment of certain past due payments, totaling $8,819.71.  Ex. C-14.  Mr. Tota admitted through testimony to owing certain charges, less the amount he repaid after December 19th.  3 N.T. at 131.  This testimony is supported by a letter dated January 10, 2006, sent from Mr. Tota's attorney to Ginko's attorney, which letter referred to a payment of one of the charges, acknowledged a debt of more than $8,100, and referred to a payment arrangement made by the parties to cure this delinquency in light of Mr. Tota's cash flow situation.  See ex. C-15.

After correcting for several minor mathematical errors made by both parties, I find that the charges demanded on December 19, 2005 totaled $8,820.33, of which Mr. Tota paid $4,715.08 after December 19th, and thus he still owes Ginko

62

$4,105.25.[24]  To the extent that Mr. Tota now disputes some of the charges demanded in

December 2005, I find that he had the opportunity to challenge those when the demand

was made, and instead entered into a payment agreement with Ginko, by which the lessor

agreed to accept repayment over time, rather than insist upon immediate repayment as

permitted in its lease.[25]  Accordingly, I will consider any current challenges to those pre-

December 2005 demand letter charges as waived.

Similarly, though Ginko now asserts additional pre-December 2005 charges

as still owed, I find between the its records and its December 2005 demand letter, the

latter, contemporaneous letter is the more accurate representation of what amounts were

past due at that time.  Indeed, added weight should be given to this demand letter because

Pennsylvania common law obligates a lessor to issue such a written demand (unless

waived by the lease, and ¶ 25 of the Lease Addendum contains no such waiver) prior to

exercising its rights against its tenant.  See, e.g., Elizabethtown Lodge No. 596 v. Ellis,

---

[24]Mr. Hing added up the Center City taxes incorrectly: the total unpaid as of this
letter was $535.60, not the $534.98 he recited.
　　　　　Mr. Tota asserts in his post-trial memorandum that he made $5,186.46 in
payments pursuant to the parties' installment agreement.  However, the lessor's ledger indicates
that he made four payments of $1,000 and one of $715.08, totaling $4,715.08.  His check stubs,
ex. C-49, confirm this amount rather than the asserted amount.
　　　　　Finally, I note that attorney Gough stated in his January 10th letter that Mr. Tota
had so far paid $1,715.08, leaving $8,104.63 to pay, but subtracting the amount already paid
from Mr. Hing's (incorrect) total of $8,819.71 leaves $7,104.63 left to pay.

[25]Mr. Tota argued that the $176.28 charged as 25% of the Center City Assessment
on February 28, 2003 was the full amount of this 2003 assessment rather than a pro-rata portion
of 2.5 months representing half of October 2003 plus November and December 2003, which
Ginko had done with the real estate taxes.  To the extent that he agreed to the amount recited in
December 2005, I view that issue as waived due to the lessor's agreement to accept payment over
time.

391 Pa. 19, 24 (1958).  Accordingly, the December 2005 demand letter would be drafted with care.

Therefore, I will not consider the parties' various disputes as to amounts owed or paid prior to the December 19, 2005 demand letter.  See Antipas v. 2102, Inc., 1998 WL 306537, at *3 (E.D. Pa. June 9, 1998) (the lessor's acceptance of funds demanded in its  notice to the lessee means that the lessee "could not have been considered in default for unpaid rent").  Accordingly, as of the date of sale of the realty, June 2006, Mr. Tota owed $4,105.25 in pre-demand letter charges to Ginko.

Ginko asserts and Mr. Tota disputes certain listed charges now claimed by the lessor that arose after its December 19th letter.  Ginko's ledger lists rent payments, late fees on rent, water and sewer charges, and Center City and real estate taxes.  From December 19, 2005 onward, the ledger itemizes $30,285.94 in charges and $28,584.06 in payments, leaving $1,701.88 due.  But as the amount paid by the lessee after December 19th includes $4,715.08 paid on accordance with the parties December 2005 agreement, I will not include those repayments against the $30,285.94 assessed, leaving $6,416.96 unpaid for 2006 as of the date that Ginko sold its realty in June 2006.

Mr. Tota, however, contends that this figure is inaccurate because it includes late charges and tax payments that were wrongly assessed after December 2005. He also maintains that he was not given credit for water and sewer charges paid in 2006. Upon my review of the evidence, I agree with Mr. Tota in part only.[26]

---

[26]I note that while Mr. Tota complains that he was not presented with real estate, use and occupancy, or special service bills prior to the end of 2005, Claimant's Post-trial Memorandum, at ¶ 136, he does not make the same claim regarding these bills from 2006 onward.  As noted earlier, I consider any issues regarding pre-December 2005 charges as waived

(continued...)

Mr. Tota first challenges fees assessed on allegedly late rent payments.  I agree with him that the payments of December 2005 through June 2006 do not appear late.  The Lease Addendum provided for a late charge of 5% if not paid within 10 days of the due date, and Mr. Tota made his rent payments on December 5th, January 5th, February 3rd, March 6th, April 5th, May 2nd, and June 2nd of that period.  Therefore, his payments were timely.

However, Mr. Tota's November 2005 rent payment, though paid timely on November 3rd, was not paid in full.  Under the lease agreement, November 2005 marked the third year of the lease, and accordingly the rent increased from $3,710.00 to $3,932.60.  See ex. C-2, § 2.  But Mr. Tota paid only $3,710.00 in November 2005.  Since the lease provides for a five percent late fee assessed against "the amount of such item of rent, additional rent or other charge due," id., Ginko was entitled to assess the late fee of 5% of $3,932.60, or $196.63.  Compare In re Oxford Hospital. Inc., 1988 WL 138740, at *2 (Bankr. E.D. Pa. Dec. 20, 1988) (five percent late charge, "plus interest on such delinquent amount from the due date thereof until paid.").  To the extent that Ginko was entitled to apply new payments to the oldest outstanding debt, i.e., on a rolling basis, then each month that the rent shortfall was not paid up, Ginko could assess a new late fee.

Neither the Lease nor any of its addenda directs how payments were to be applied.  Compare In re Reed, 247 B.R. 618, 621 (Bankr. E.D. Pa. 2000) (setting forth application of payments, with payments applied fifth to late charges).  There was no evidence that Mr. Tota designated how his subsequent rent payments were to be

---

[26](...continued)
by virtue of the parties' repayment agreement.

65

credited—he supplied only his own check stubs, not copies of the actual checks sent to Ginko that could have noted in the memo section to what the payment was directed.

As noted earlier, Ginko's practice appeared to be to assess late fees on monthly rent only, not on unpaid (therefore late) utility and tax bills (which the Lease Addendum defined as "additional rent," subject to late charges).  Pursuant to Toll-Barkan Co. v. Toll, 193 Pa. Super. at 225, 164 A.2d at 38, quoted above, in the absence of agreement, tenant payments may be applied in the way most beneficial to the lessor.  Thus, Ginko had the right to apply the rent payments on a rolling basis, curing the earlier monthly delinquency and applying the residue to the current month.  This would yield late fee charges until June 2006, as were assessed.[27]  Accordingly, I shall make no disallowance of the late fees now demanded by Ginko.

Next, Mr. Tota argues that Ginko's ledger lists his 2005 real estate tax obligation in February 2005 and again in January 2006.  On February 28, 2005, the ledger reflects a $2,234.59 charge to the lessee for real estate taxes.  See ex. D-1.  On January 1, 2006, Ginko lists in its ledger that the lessee owed $1,191.21 and $1,021.04 in real estate taxes, totaling $2,212.25, even though 2006 real estate taxes are later assessed on March 23, 2006 ($1,203.00 plus $1.031.00).  See ex. D-2.

Ginko agrees that the 2005 taxes were listed again in January 2006, explaining Mr. Tota had not yet paid them.  3. N.T. at 108.[28]  The 2005 tax obligation of $2,234.59, however, was included by Ginko in its demand letter of December 2005,

---

[27]The December 11, 2005 late fee was subsumed by the December 19, 2005 letter. Thus, six $196.63 late fees were chargeable to the lessee and these are included in the lessor's ledger.

[28]There was no explanation for why the amounts differ.

66

regarding which the parties settled upon a payment plan as explained above.  Therefore, it
is unlikely that this second listing represents an obligation distinct from the one included
in the parties' repayment agreement.  Accordingly, I will reduce from the amount owed
by Mr. Tota post-December 2005 the January 2006 tax charges of $2,212.25 as
duplicative of his pre-December 2005 obligation.

   Although I agree with Mr. Tota that his payment of $273.38 represents
payment for water bills entered on Ginko's ledger on April 18, 2006 and May 16, 2006 in
the amounts of $132.34 and $141.04, this was credited by Ginko on June 2, 2006 on its
ledger, therefore no further reduction for this payment need be made from Ginko's
present claim.

   Finally, Mr. Tota alleges that Ginko failed to apportion properly the 2006
real estate taxes charged to him, given that Ginko sold the building on June 8, 2006.  Mr.
Tota reasons that Ginko would have received credit from the realty purchaser for almost
seven months of real estate taxes, and so should assess Mr. Tota for his portion of only
five months of taxes, rather than the six months included in the 2006 ledger of expenses.
The realty sale closing statement, however, does not support Mr. Tota's argument.

   The first page of the settlement reflects that taxes were apportioned fifty
percent each to buyer and seller.  See ex. C-51.  Moreover, Mr. Tota did not contend that
the new owners demanded payment for seven months of 2006 taxes rather than the six
months remaining owed; therefore to the extent Mr. Tota should have paid his portion of
five months property taxes to Ginko and seven months to the new lessor, but paid six
months to each, he failed to prove any offset to Ginko's claim.

In sum, I find that Mr. Tota owes $8,309.96 in back rent and other charges to Ginko, inclusive of pre and post-December 2005 charges.  As this amount exceeds the $7,000 owed by Ginko on the security deposit, I find that Ginko need not refund the security deposit and its obligation to Mr. Tota will be offset by $1,309.96.[29]

An appropriate order shall be entered.

August 5, 2008
_____
date

_Bruce Fox_

_____
BRUCE FOX
United States Bankruptcy Judge

---

[29]To the extent that the lessee owes the lessor more than the tenant security deposit, the excess will be offset against the lessee's claim for damages.  Moreover, given the subordination agreement with Regis regarding lost profits, the offset will be made against the lessee's unsubordinated portion of the claim.